Vito **VOLPICELLI,** Petitioner,

v.

Dominick **SALAMACK,** Superintendent, Bayview Correctional Facility, Respondent.

Civ. No. 77–3357.

United States District Court, S. D. New York.

Feb. 23, 1978.

**654**

Susan N. Herman, Pierce J. Gerety, Prisoners' Legal Services of New York, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for respondent; Patricia C. Armstrong, Asst. Atty. Gen., New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Petitioner, Vito Volpicelli, is now serving concurrent sentences of up to fifteen years at Bayview Correctional Facility, New York City, imposed under a judgment of convic- tion of conspiracy and various related sub- stantive counts of burglary, robbery, grand larceny and felonious possession of weapons after a jury trial in the New York State Supreme Court, Suffolk County, in July 1973.[1]

He seeks his release upon a writ of habe- as corpus upon allegations of violation of his federally protected right to due process of law. Essentially, petitioner claims that he was denied a fundamentally fair trial by references to alleged mob contacts during his cross-examination by the Assistant Dis- trict Attorney and by the testimony of a rebuttal witness on the same subject. Peti- tioner also claims that the cross-examina- tion and the rebuttal testimony were imper- missible since they were based upon evi- dence obtained in violation of *Massiah v. United States*.[2] Further, petitioner asserts that the use of such prejudicial evidence by the Assistant District Attorney constituted prosecutorial misconduct requiring vacatur of the conviction. After a word-by-word review and study of the 1700 page tran- script[3] of the trial which lasted almost three weeks, this Court is convinced beyond a reasonable doubt that petitioner was not deprived of due process of law and that he was afforded a fundamentally fair trial.

Volpicelli was convicted for the part he played in originating, planning and execu- ting an armed robbery at the home of Ber- tram and Muriel Virag at Centerport, Suf- folk County, New York, on September 11, 1972. He was not present at the Virag home when the robbery was committed by four other men; however, he was cast by the prosecution as the prime mover in the conspiracy to commit the crime and in aid- ing and abetting the substantive offenses. Because of the importance of the factual record for the disposition of petitioner's claims, the Court reviews the evidence in detail.

---

1. The judgment of conviction was affirmed without opinion by the Appellate Division, 46 A.D.2d 846, 362 N.Y.S.2d 425 (1974); leave to appeal to the Court of Appeals was denied February 4, 1975.

2. 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). *Massiah* was recently reaffirmed by the Supreme Court in *Brewer v. Williams*, 430 U.S. 387, 400–01, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

3. References to the Trial Record will be cited as T.R.

At the trial petitioner did not dispute that a robbery of the Virags had occurred or that the other defendants had committed it. Compelling testimony of eyewitnesses and police officers established the following. On September 11, 1972, at about 12:30 p. m., petitioner's codefendants, Myers, Mann, McGill and Wade,[4] drove to the Virag residence. Myers was driving a white Pontiac registered to Pamela Volpicelli, petitioner's wife.[5] McGill and Wade, posing as deliverymen, gained entrance to the home while Myers and Mann waited outside. After binding and gagging the maid, a paper hanger and the Virag son, Jeffrey, the burglars ransacked the upstairs office of Mr. Virag and the master bedroom. They left with approximately $18,000 worth of jewelry and several hundred dollars in cash. The robbers proceeded to a gas station on Northern Boulevard, Queens, a few blocks from Volpicelli's apartment, where Myers telephoned petitioner. Volpicelli, as he testified, asked them to come up to his apartment, which they did. Within ten minutes McGill and Mann departed.

Soon after the robbers had left the Virag premises, the victims notified the police, who issued a general alarm. The authorities obtained the license number of the Volpicelli car through an alert postal clerk employed at a post office close to the Virag home, who shortly before the holdup had noted the number because his suspicions had been aroused by four men in the car; he identified three of the four men at the trial. As a result of this lead, the police, within one-half to three-quarters of an hour of the holdup, located the Volpicelli automobile outside the apartment house where he lived. Thus when McGill and Mann left the apartment house they were taken into custody as they approached the car; the police also seized a brown attache case in

the possession of McGill which contained the stolen jewelry. Myers, who left the Volpicelli apartment a few minutes after McGill and Mann, upon seeing the police cars and his confederates in custody, retreated to petitioner's apartment and informed him that Mann and McGill had been arrested. Immediately thereafter both proceeded to the street, where Myers was arrested. Volpicelli was taken to the police station for questioning, but was released; he was arrested ten days later. Some seven hours after Myers' arrest on the day of the robbery he made a detailed confession setting forth his role, as well as that of each participant, including petitioner.

It was no coincidence that the robbers had chosen the Virag residence. Volpicelli had known the Virags since 1970, when he courted their former daughter-in-law, Nicola. She had been married to their son Richard, who had died in 1968. Volpicelli had visited the Virag residence on several occasions in 1970 while Nicola was living there. He did not visit the home again until August 1972,[6] when he took Myers there ostensibly to discuss with Mr. Virag the prospect of beginning a landscaping business. More will be said later concerning the differing explanations of this visit.

During the trial, defendant Myers was permitted to plead guilty to robbery in the third degree upon an agreement to testify as a prosecution witness. His plea was accepted by the Court upon Myers' representation that he would testify truthfully and consistently with his confession which he made on the day of his arrest and which he continued to aver was the truth.

Up to this point the Court has referred to testimony uncontradicted at trial by the petitioner. The major portion of the State's case against Volpicelli was provided

---

4. Volpicelli, McGill and Wade were convicted by the jury; Myers by his plea of guilty. The trial was severed as to Mann due to his counsel's illness.

5. The car was registered in the name of petitioner's wife but was generally referred to as his car; the same reference will be made in this opinion.

6. Virag testified that this call by petitioner in the company of Myers was made on August 30, 1972, 12 days before the robbery, and offered a business record to corroborate the date. The petitioner, who generally acknowledged the verity of Virag's testimony, placed the date as August 20 or 21, 1972.

by the testimony of Clifford Myers, which petitioner, who took the stand on his own behalf, contradicted in material respects.

Myers presented strong direct evidence of petitioner's role in the initiation and consummation of the armed robbery. Myers testified that he met Volpicelli for the first time in July 1972 at Cape Coral, Florida. One George Ruffo was also present. He next met Volpicelli in Miami, when petitioner loaned Myers money to fly to New York. After arriving in New York, Myers visited Volpicelli's home in Douglaston, Queens, in August 1972; also present were McGill and Mann. At that time Volpicelli stated that he had been engaged to a woman who lived with her ex-parents-in-law in Huntington, Long Island, and that the home contained large amounts of money and jewels. Volpicelli proposed a robbery of the home, and it was decided that Myers would drive Volpicelli's automobile and that any fruits of the crime would be evenly divided. A few days later Volpicelli, Myers, Mann and McGill, joined by Ruffo, travelled to the Virag home in two cars, arriving there at about 9:30 that night. They remained there for about one hour, familiarizing themselves with the area and the house.

Myers was not convinced that Volpicelli knew the owners of the home; in order to persuade Myers that he did, petitioner devised a pretext for a face-to-face visit with Virag. Late in August, Myers and Volpicelli, again joined by Ruffo, drove to the Virag ·residence. Volpicelli introduced Myers to Mr. Virag, and Volpicelli and Virag had a brief discussion. Myers, after the visit, was satisfied that Volpicelli knew the Virags as he had stated.

The plans for the robbery were finalized, according to Myers, around 1 a. m. in the morning of September 11, at a meeting attended by him, Volpicelli, McGill and another unidentified person. It was decided that Volpicelli would stay in his apartment because he was known to the Virags and that the robbers would use the Volpicelli car with Myers as the wheelman. The robbers met again at the Volpicelli home later

that morning just prior to the holdup and left for the Virag home from there. After the robbery, they drove back to the vicinity ·of petitioner's apartment, calling Volpicelli from a nearby gas station, and reported that the robbery had taken place. Volpicelli told them to come up to the apartment, which they did, and there they divided the stolen cash and made arrangements for McGill to fence the stolen jewelry. After this meeting, which lasted but a short time, McGill and Mann left the apartment; Myers followed shortly thereafter. When Myers got outside, he saw McGill and Mann in handcuffs. Myers then returned to petitioner's apartment and reported the arrest to Volpicelli, who thereupon said he would get them out and then proceeded to an underground garage. Volpicelli, to whom Myers had previously returned the keys to the car, gave him the keys again and told him to move the car. Myers and Volpicelli went out to the street, and Volpicelli, in response to a question from a police officer, identified Myers as the person to whom he had loaned his car. Myers stated that Volpicelli exclaimed: "What, I loan you my car and you pulled an armed robbery?" [7]

Petitioner took the stand on his own behalf. His version of places and events does not differ substantially from Myers' testimony, except that he casts them in an innocent light. Volpicelli testified that he had never been convicted of a crime and that he had been employed in the construction industry. He first met the Virags in the spring of 1970 at their home when he was courting their ex-daughter-in-law. His plans to marry did not eventuate. He was introduced to Myers by Ruffo at Fort Myers, Florida, in July 1972 and met him again in Miami later that month. Ruffo told Volpicelli that Myers needed money to get to New York where he would look for work. In August 1972, Myers visited petitioner at his home in Douglaston, and several times that month petitioner lent Myers his car. During August, Myers told Volpicelli that he needed a job and some money,

7. T.R. at 695.

and Volpicelli, who was also temporarily out of work due to a construction strike, suggested visiting Mr. Virag to discuss the possibility of starting a landscaping business. They called on Virag on August 20 or 21, but he asked them to return because he had to leave on urgent business. Ruffo accompanied Myers and petitioner; he remained in the car and was not introduced. Volpicelli did not return to discuss the landscaping business because the strike ended and he went back to work. Petitioner loaned Myers his car on September 6 or 7 and did not see him again until September 10, the night before the robbery when Myers called at his home with a girlfriend at around 9:30. Volpicelli was playing pinochle with his building superintendent, Mr. Leonard,[8] and did not speak to Myers, who stayed for an hour and a half. Petitioner gave Myers "permission to take the car home but return it before 3:30" the next day (September 11). He next saw Myers about 1:15 p. m. on September 11 (about forty-five minutes after the robbery). Myers had telephoned from a nearby gas station and Volpicelli suggested that he come up to the apartment to discuss the return of the car. Myers did so, accompanied by McGill and Mann; they had a cold drink each and McGill and Mann left in five or six minutes. Myers left shortly thereafter and returned within a few minutes, saying that he had seen the others in handcuffs. Volpicelli suggested they go downstairs to see what had happened. A police officer was attempting to ascertain the owner of the Pontiac used in the robbery and Volpicelli asked Myers what had happened. Myers said "nothing" and asked Volpicelli to say that the two of them had spent the morning together. Volpicelli declined and when Myers turned to leave, petitioner grabbed his arm. Volpicelli then identified Myers as the person who had driven his car that day.

In sum, Volpicelli denied any arrangement with Myers or any other codefendant to rob the Virag home. He denied any knowledge of the robbery. He put an innocent cast on his lending his car to Myers on several occasions as acts of friendship; so, too, he stated that his visit to the Virag home in August 1972 was for the sole purpose of soliciting landscaping business. He denied Myers' testimony that when Myers and the other confederates were at his apartment within an hour of the holdup there was any distribution of cash proceeds of the robbery or any discussion to fence the jewelry.

## THE CHALLENGED CROSS–EXAMINATION AND REBUTTAL TESTIMONY

The basis of petitioner's claims in this proceeding is twofold: (1) his cross-examination by Assistant District Attorney Sullivan as to statements he allegedly made to Detective Jack Taylor of the Suffolk County Homicide Squad after his arrest and before his arraignment which related to information Volpicelli would provide in return for "a deal" on the pending charges; and (2) the rebuttal testimony of Detective Taylor, who testified affirmatively as to the foregoing matters which Volpicelli denied on cross-examination. We consider these separately.

Under cross-examination, Volpicelli testified that he and Taylor had a conversation:

Q [Sullivan, Assistant District Attorney] Remember what it concerned?

A [Volpicelli] Yes, he asked me if I knew of a murder of a Mr. LoBosco. I told him I did not. In fact, I wasn't even in the country at the time.[9]

Q Isn't it a fact that you told him that you would contact people you knew in New York City and get an answer for him, but that it might cost $1,000?

---

**8.** Leonard was called as a defense witness. He testified that on the night of September 10, 1972 he played pinochle with Volpicelli at the latter's apartment from about 7:30 to midnight; that during this time Myers came in with a young lady and remained about an hour and a half; that the only conversation he recalls is

that Volpicelli asked Myers if he wanted to play and Myers said no. This testimony is not inconsistent with Myers' testimony that the robbers met at Volpicelli's home later that night.

**9.** T.R. at 1340–41.

A No, I did not.

Q Isn't it a fact that you told him that you had contacts in the mob in New York City and particularly in Nassau County and knew of a potential heroin deal to take place in Huntington?

A I don't know anybody in Nassau or Suffolk. The only people I know is in Queens and Manhattan.

Q You knew the Virags, didn't you?

A That is a party [sic?].

Q Isn't it a fact that you said that you would tell him these things if you could get a deal with respect to your present indictment?

A I did not, because I didn't expect to be convicted for the indictment. Why would I need a deal?

Q Did you tell him . . . that you would get the name of the person responsible for a murder of Jerry Lo-Bosco?

A I don't know anybody in Nassau County.

Q Is your answer no?

A No.

Q You never told him you were in with a few guys?

A What do you mean "in"?

Q In New York City.

Mr. VUTURO [Volpicelli's attorney]: I object to the form of the question.

MR. SULLIVAN: Let me put it a different way.

Q Did you ever tell him that you were in with a few guys and through them you could advise the Suffolk County Police of various gambling activities that took place in Suffolk County?

A I did not.

Q Isn't it a fact you told him all these things in an exchange for a commitment by him that he would see what he could do for you in getting you a deal if you came through with the information you promised him?

A He asked me if I knew of any information, he would help me. And I said, "I don't have any information and I don't need help."

. . .

Q Do you remember at one point Detective Taylor saying to you, this is on the occasion when you were in his office, Mr. Volpicelli, in words or substance, now, Vito, we know you did this thing, and you laughing at him and saying, well you do your job and I'll do my job?

A He never said anything of the sort.[10]

After extended cross-examination on other issues, Sullivan ended his examination by returning to the Taylor conversation. He asked:

Q Well, tell me, Mr. Volpicelli, do you ever remember saying to him, what can you do for me, and Detective Taylor saying to you, well, if you come across for me I'll see if I can get an appointment with the assistant district attorney to see if I can get you a deal?

A He asked me if I wanted a deal and I told him I didn't need a deal.

Q I ask you to recall this, Mr. Volpicelli: Isn't it a fact that you said to him that you needed a deal and that he said to you why, and that you said to him you get involved with shit heads, and this is what happens, in words or in substance?

A Well, at that time when he was talking to me I was being arraigned and I don't really remember the conversation that well.[11]

We now consider the rebuttal testimony of Detective Taylor, which follows:

Q [Sullivan] Where did you meet with [Volpicelli], specifically?

A [Taylor] They brought him into the Homicide Squad and I asked him if he was willing to talk to me in reference to another case, the LoBosco murder.

MR. VUTURO: Your Honor, I object to any conversations or any discussions as to this LoBosco murder. It is a collateral issue and the rule is cut and dry in New York.

10. T.R. at 1341–44.

11. T.R. at 1397.

THE COURT: Objection sustained.

MR. VUTURO: I ask that the jury be directed to strike it from their minds.

THE COURT: Yes, you will disregard it, members of the jury.

A  I advised Vito that if he could help me out with reference to my case, I could probably help him out in reference to his predicament.

Q  What did he say?

A  He said that he would help me out all he could.

Q  What further was said with respect to this?

A  After he was arraigned and we got back, I advised him—I asked him if he knew any people—if he knew any influential people that could give him the information. He told me he did.

Q  Proceed.

A  I asked him could he tell me who these people were. He said, no, but they were high up.

MR. VUTURO: Your Honor, in relation to what now?

MR. SULLIVAN: I have been precluded Judge—

MR. VUTURO: This is in relation to what?

THE COURT: I'm not sure whether he is talking about this case or what.

MR. VUTURO: Then I'll object because the Court has already given a decision on that. I don't know what he's talking about, and if it is regarding a collateral matter—

THE COURT: If it is collateral matter, he may not go into it.

MR. VUTURO: Your Honor, in the meantime the jury is listening to all these conversations about influential people. What is he talking about?

MR. SULLIVAN: May I be heard?

THE COURT: Fix that.

Q  Detective, avoid, if you will, any testimony by yourself with respect to anything other than the present case, any other cases. If you can do that, if you can excise that from your testimony, indicate, if you will, exactly what you said and what Volpicelli said with respect to this case.

A  He asked what he could do for himself on this case. I told him if he could get me information, that I could go to a D.A. and to a judge and advise them what he did for us and make a recommendation in his case.

Q  Did he make a reply to that?

A  Yes. He said he would do all he could.

Q  What is the next thing you said?

A  I can't bring up—he said he would see somebody for me. He told me who the person was. He said it was a captain in the Mafia in Nassau County.

Q  With respect to this case that we have on trial—

MR. VUTURO: Your Honor, I'm going to ask, respectfully ask, that the jury be directed to disregard that last remark. He is still referring to some other case other than this.

THE COURT: Yes. You will disregard it members of the jury. We do not want to go into any other cases. Just what he said to you with reference to this case.

THE WITNESS: All right, your Honor.

A  At the end of the conversation at the Homicide Squad, I told him, I says, "You're going to need help and I'm the guy who can help you. You got yourself into some mess." He said, "That's what you get for working with shit heads." [12]

## PETITIONER'S CLAIMS

Petitioner contends that all of the foregoing testimony, on cross-examination and in rebuttal, concerning his conversation with Detective Taylor, was inadmissible because the conversation took place without the presence of his counsel and no valid

12. T.R. at 1406–10.

waiver of counsel was obtained.[13] He further asserts he was denied a fair trial by the prosecutor's references, during cross-examination, to his alleged contacts with "the mob" and by Taylor's rebuttal testimony that petitioner would see "a captain in the Mafia." The Court will consider the admissibility issue first.[14]

The State concedes here, as it did before the State Appellate Division,[15] that the conversation between Volpicelli and Taylor was not admissible as part of the State's case-in-chief. It also conceded in the State appeal that petitioner's conversation with Taylor "did not contradict a specific part of his direct testimony."[16] However, it argues that the evidence was admissible for general impeachment purposes. Moreover, it urges that when the detective stated that the petitioner had gotten himself into some mess, his response "That's what you get for working with shit heads" was an admission that affected his credibility with respect to his narration of events preceding and after the crimes, particularly his testimony as to how it came about that the men were in his apartment so soon after the holdup. It contends that such impeachment through the use of the tainted evidence is permissible under the rationale of *Harris v. New York*[17] and *Oregon v. Hass.*[18]

In *Harris* and *Hass* the Supreme Court ruled that evidence obtained in violation of *Miranda v. Arizona*[19] may be admitted at trial if the defendant testifies in his own defense and makes statements inconsistent with the earlier illegally obtained statements. The reasoning behind *Harris* is that the right to testify

> cannot be construed to include the right to commit perjury. . . . Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. . . .

> The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.[20]

The limits of *Harris* and *Hass* have not been defined by the Supreme Court. However, a growing number of federal and state rulings have confined their rationale: they have permitted use of illegally obtained inconsistent statements of the defendant only where the defendant's testimony on *direct* examination specifically initiates the issue to which the inconsistent statements

---

**13.** Petitioner's claim that the conversation with Detective Taylor occurred after his arrest, without the presence of his lawyer and without valid waiver of counsel, is not disputed by the State. Thus the testimony was unconstitutionally obtained whether characterized as a violation of *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), or *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**14.** This Court questioned whether the petitioner fully exhausted in the state courts the claims he asserts here. Indeed, in a responsive letter to the Court, petitioner's counsel concedes that "the arguments in the state appellate brief are not as explicit in their reliance .on the Due Process Clause of the Fourteenth Amendment as are petitioner's submissions in the instant proceeding." However, in view of the extensive review of the record the Court has undertaken, as well as the State's concession that petitioner has adequately exhausted state remedies, the Court finds it desirable to reach the merits of petitioner's claims. *Cf. Bergman v.*

*Lefkowitz,* 569 F.2d 705 at 713 n.14 (2d Cir. 1977).

**15.** Brief for Respondent at 41, *People v. Volpicelli,* 46 A.D.2d 846, 362 N.Y.S.2d 425 (1974).

**16.** *Id.* at 44.

**17.** 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

**18.** 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975).

**19.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**20.** 401 U.S. at 225–26, 91 S.Ct. at 645 (footnote omitted). *See Oregon v. Hass,* 420 U.S. 714, 722, 95 S.Ct. 1215, 1221, 43 L.Ed.2d 570 (1975) (*Miranda* not to be "perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances.").

are directed.[21] A general denial of the commission of the offense is not sufficient to "open the door" to use the impeaching testimony.[22]

This interpretation of *Harris* and *Hass* appears to be consistent with the Supreme Court opinions upon which those decisions rely. *Harris* was based upon the Court's decision in *Walder v. United States*.[23] There the defendant, going beyond the immediate issues in the case on trial, denied on direct examination that he had ever sold or possessed narcotics. It appeared that two years before the trial he had been indicted on another charge for possession of heroin, and had successfully suppressed the seized heroin because it had been obtained through an unlawful search and seizure. In that circumstance, the Court permitted the impeachment of Walder by the admission of the illegally seized and suppressed heroin and by the testimony concerning it by a police officer. The Court, however, "sharply contrasted" its earlier decision in *Agnello v. United States*,[24] where it had not permitted introduction of an illegally seized can of cocaine after the prosecutor on cross-examination had asked the defendant whether he had ever seen cocaine and the defendant denied having done so. The *Walder* opinion, written by Justice Frankfurter, characterized *Agnello* as follows:

> [In *Agnello*] the Government, after having failed in its efforts to introduce the tainted evidence in its case in chief, tried to smuggle it in on cross-examination by asking the accused the broad question "Did you ever see narcotics before?" After eliciting the expected denial, it sought to introduce evidence of narcotics located in the defendant's home by means of an unlawful search and seizure, in order to discredit the defendant. In holding that the Government could no more work in this evidence on cross-examination than it could in its case in chief, the court foreshadowed, perhaps unwittingly, the result we reach today:

> "And the contention that the evidence of the search and seizure was admissible in rebuttal is without merit. In his direct examination, Agnello was not asked and did not testify concerning the can of cocaine. In cross-examination, in answer to a question permitted over his objection, he said he had never seen it. He did nothing to waive his constitutional protection or to justify cross-examination in respect of the evidence claimed to have been obtained by the search . . . ." 269 U.S., at page 35, 46 S.Ct., at page 7.[25]

*Agnello* was not cited in *Harris* or *Hass* and has not been overruled.

The principle that a defendant may not be impeached by illegally obtained evidence unless he opens the door on direct examination finds support in a recent decision by our Court of Appeals, as well as several recent state court opinions.[26] It is also in accord with rulings that have permitted admission of tainted evidence after the defendant on direct examination has testified

---

21. *United States v. Mariani*, 539 F.2d 915, 921–24 (2d Cir. 1976); *Cannito v. Sigler*, 321 F.Supp. 798, 801–04 (D.Neb.), *rev'd on other grounds*, 449 F.2d 542 (8th Cir. 1971), *cert. denied*, 407 U.S. 912, 92 S.Ct. 2446, 32 L.Ed.2d 686 (1972); *People v. Taylor*, 8 Cal.3d 174, 104 Cal.Rptr. 350, 501 P.2d 918 (1972); *State v. Kidd*, 375 A.2d 1105 (Md.1977), *cert. denied*, —— U.S. ——, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977); *People v. Wise* 401 N.Y.S.2d 577 (App. Div. 1978).

22. *See Cannito v. Sigler*, 321 F.Supp. 798, 803 (D.Neb.), *rev'd on other grounds*, 449 F.2d 542 (8th Cir. 1971), *cert. denied*, 407 U.S. 912, 92 S.Ct. 2446, 32 L.Ed.2d 686 (1972); *People v. Taylor*, 8 Cal.3d 174, 184–85, 104 Cal.Rptr. 350, 356, 501 P.2d 918, 924 (1972). The cases rely upon the Supreme Court's statement in *Walder*

*v. United States*, 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954), that a defendant "must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief."

23. 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).

24. 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925).

25. 347 U.S. at 66, 74 S.Ct. at 356 (footnote omitted).

26. *See* cases cited in note 21 *supra*.

inconsistently with the tainted evidence.[27] And it is well supported by the recognition that it is in the interest of the fact-finding process that a defendant give his version of the events.[28]

Thus, the answer as to whether tainted evidence may be admitted to impeach the defendant, as recently stated by this Circuit, "lies in the scope of [defendant's] testimony on direct examination." [29] Accordingly, a threshold question is whether the direct testimony of Volpicelli "opened the door" for his cross-examination on otherwise inadmissible evidence and for the introduction of rebuttal testimony solely on the issue of credibility. A careful review of petitioner's direct testimony reveals that at no time did he or his counsel refer to Detective Taylor or any conversation petitioner had with Taylor. Nor did petitioner's direct testimony mention the LoBosco murder or make reference to any alleged mob or Mafia connections. Thus there was no inconsistency between petitioner's *direct* testimony and the rebuttal testimony, as there was in *Harris* and *Hass*. Rather, as was the situation in *Agnello*, the prosecutor elicited the expected denials on cross-examination and then introduced the tainted evidence in rebuttal.

■■■ In sum, testimony concerning petitioner's conversation with Detective Taylor as to proposals for a deal in exchange for Volpicelli's information about the alleged criminal activities of others should not have been permitted, either upon cross-examination or in rebuttal. However, the issue is much closer with respect to defendant's statement as testified to by Taylor: "That's what you get for dealing with shit heads." Petitioner's testimony at the trial that Myers, McGill and Mann were at his apartment soon after the holdup but that it was a social visit during which each had a cold drink clearly was a denial of Myers' testimony that the participants divided the cash booty and arranged to fence the stolen jewelry. Petitioner's negation of what transpired at that meeting opened the door so as to permit questioning on·whether he made the above statement since it readily can be deemed an admission that he was a member of the conspiracy.

Petitioner's second claim concerns his cross-examination by the prosecutor who asked whether he had contacts in "the mob" and Taylor's rebuttal testimony that petitioner said he would see a person who "was a captain in the Mafia." He claims that these references were inherently prejudicial, could not be cured by cautionary instructions from the judge, and thus their admission denied him due process. Petitioner calls this Court's attention to several opinions that have held that the prosecutor's attempt to link the defendant to organized crime so infects the trial that any ensuing conviction cannot be permitted to stand.[30]

27. *See United States v. Tweed*, 503 F.2d 1127, 1129–30 (7th Cir. 1974); *United States v. Caron*, 474 F.2d 506 (5th Cir. 1973); *United States ex rel. Wright v. LaVallee*, 471 F.2d 123, 127 (2d Cir. 1972), *cert. denied*, 414 U.S. 867, 94 S.Ct. 167, 38 L.Ed.2d 87 (1973); *United States ex rel. Walker v. Follette*, 443 F.2d 167, 170 (2d Cir. 1971).

28. If impeachment by illegally obtained evidence is . . . allowed to impeach the defendant's general credibility regardless of what he testifies to on direct, no way remains for a defendant who takes the stand to avoid having the suppressed evidence come to the jury's attention. Consequently the defendant would be deterred from taking the stand if he fears that evidence might be used to impeach him even though his testimony could provide valuable aid to the jury in ascertaining the truth.

. . . The Court in *Harris* stressed the jury's need to assess credibility, but the jury's opportunity to hear all of the relevant evidence is highly significant in accurate and just determinations. If the defendant's right to take the stand and his right to have illegally obtained evidence suppressed are to have any significance at all, *Harris* should be restricted to instances where defendant on direct examination initiated the issue to which impeachment is directed.

3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 607[09], at 607–89 to 607–90 (1977).

29. *United States v. Mariani*, 539 F.2d 915, 923 (2d Cir. 1976).

30. *United States v. Love*, 534 F.2d 87 (6th Cir. 1976) (per curiam); *United States v. Perry*, 512 F.2d 805 (6th Cir. 1975) (per curiam). *See United States v. Schwartz*, 548 F.2d 427, 431–

With all due respect to these courts, this Court is unwilling to adopt a "per se" rule that any mention of "the mob" or the "Mafia" in a trial renders the entire proceeding constitutionally inadequate.[31] Before a federal court may set aside a state court judgment of conviction, it must be convinced that the conduct of the proceedings in the state court were not merely less than perfect, but rather that they offended fundamental principles of justice and fair play—in short, that the claimed errors, either singly or in totality, were of such an egregious nature that petitioner was deprived of a fair trial.[32]

The issue cannot be resolved by isolating a single incident but must be determined against the totality of the evidence presented at the trial.[33] A reviewing court cannot deal in hypotheticals or after-the-fact suppositions; it must plunge itself into the record to obtain the full flavor and atmosphere of the trial in order to evaluate the effect the challenged evidence had on the trial as a whole. It is only through such immersion and careful study of the entire trial record and of the separate testimony of each witness in relation to that of other witnesses, that a reviewing court can do justice to the claims of a defendant for the redress of alleged violation of his constitutional rights and to the strong public interest in not upsetting convictions fairly arrived at. The Court has undertaken such a study here. In making this study, it has borne in mind the admonition of Mr. Justice Frankfurter:

> It is a commonplace in the administration of criminal justice that the actualities of a long trial are too often given a meretricious appearance on appeal; the perspective of the living trial is lost in the search for error in a dead record.[34]

While particular portions of Detective Taylor's and the prosecutor's questions might well have been excluded had proper and timely objection been made, the Court finds that their admission in the course of the extensive trial did not impinge upon petitioner's right to a fundamentally fair trial as guaranteed under the due process clause of the Fourteenth Amendment. Furthermore, the Court's intensive study of the

---

32 (2d Cir. 1977); *Martin v. Merola,* 532 F.2d 191, 196 (2d Cir. 1976) (per curiam) (Lumbard, J., concurring).

**31.** Moreover, the cases cited by petitioner are readily distinguishable. In *United States v. Perry,* 512 F.2d 805 (6th Cir. 1975) (per curiam), the court found prosecutorial misconduct in the prosecutor's highly prejudicial questioning of the defendant on cross-examination. One of the questions was whether defendant was a "member of what is called the Dixie Mafia out in East Ridge." The court held the question improper because it was irrelevant to the case and was intended to besmirch the character of the defendant. Similarly, in *United States v. Love,* 534 F.2d 87, 89 (6th Cir. 1976) (per curiam), the prosecutor asked the defendant, an employee of a *debt collection* company, whether his organization "was part of another organization 'of ill character like Mafia or anything like that.'" The court found "reversal [was] required because the prosecutor intentionally and for no proper purpose injected into the trial the spectre of organized crime and the Mafia." *Id.* at 88.

In the instant case, the prosecutor's questions were not gratuitously asked with the purpose of denigrating petitioner's character. Rather, they were part of a line of questioning, the purpose of which was to establish that the defendant had been willing to furnish information to the authorities in return for working out a deal in his pending prosecution. The references to the mob were an attempt to show that petitioner had something to "trade"—that is, the identity of persons in "the mob" who might be linked to an unsolved murder.

**32.** *See Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) ("'[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.' *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)."); *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *Welcome v. Vincent,* 549 F.2d 853, 856–57 (2d Cir. 1977), *cert. denied,* 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977); *United States ex rel. Birch v. Fay,* 190 F.Supp. 105, 107 (S.D.N.Y. 1961).

**33.** *United States ex rel. Fernanders v. Fay,* 241 F.Supp. 51, 55 (S.D.N.Y.1965), *aff'd per curiam,* 359 F.2d 767 (2d Cir. 1966).

**34.** *Glasser v. United States,* 315 U.S. 60, 88, 62 S.Ct. 457, 473, 86 L.Ed. 680 (1942) (opinion of Frankfurter, J.).

trial record has convinced it beyond a reasonable doubt that the erroneous admission of Taylor's testimony and the prosecutor's questions pertaining thereto was harmless error.[35] Thus relief on both of petitioner's claims must be denied.

Petitioner argues that the references to "the mob" and the Mafia were inherently prejudicial and that the error in admitting them could not be harmless because the issue of petitioner's credibility was crucial. Since the major direct evidence against petitioner was the testimony of codefendant Myers—who had a prior conviction—the jury, he contends, had to choose between two different accounts, each of which differed as to events which occurred before and after the robbery. In such a situation, petitioner urges, the prejudicial nature of the references to the underworld and Taylor's testimony—showing the desire to make a deal, thereby reflecting consciousness of guilt—may have been enough to affect the jury's evaluation of his testimony and to credit Myers' testimony.

Whatever strength petitioner's arguments may have in the abstract, in the context of the actual trial they are without force.[36] Petitioner's basic position rests upon an erroneous assumption that the State's case was based solely upon his word against the word of his accuser. He disregards corroborative and independent circumstantial evidence of a substantial and compelling nature, much of it based upon petitioner's own testimony.[37]

Putting aside Myers' testimony, it is clear that Volpicelli's own testimony is damaging. He admitted having gone to the Virag residence with Myers and Ruffo several weeks prior to the crime. He had not been to the home or spoken to Mr. Virag for more than two and one half years and had no relationship to him of any kind during that period. Neither he nor Myers had been in the landscaping business, yet petitioner testified that the purpose of the visit to Mr. Virag was to interest him in engaging their services because both were out of work. Against the background of other facts, it strains credulity to believe that their mission to the Virag home, so soon before the holdup and so long after he had last seen Virag, was to get a landscaping job. It is significant that Volpicelli, claiming he needed work, never returned, as Mr. Virag suggested he might, nor did he ever call Virag to offer an explanation as to why he did not return.

Volpicelli, according to his testimony, had loaned his car to Myers on September 6 or 7 and did not see him again until Sunday, September 10 (the night before the robbery), at his home. At that time, he stated, he gave Myers "permission to take the car home *but return it before 3:30* because I needed it to buy materials for a job I was doing the following day [September 11]."[38]

We consider what transpired the next day. Volpicelli agrees with Myers' testimony that at about 1:15 p. m., September 11, some forty-five minutes after the holdup, Myers called him from a gas station just a few blocks from Volpicelli's home; however, the testimony of the two differs as to what was said and the reason why Myers and his co-conspirators went to petitioner's apartment. Volpicelli's version is that he received the telephone call from Myers who said he was gassing up at a nearby station; Volpicelli, to use his own words, continued: "And I asked him where. He said it was on Northern Boulevard a couple of blocks from the house. I said 'Well, since you're so

---

**35.** *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Ong,* 541 F.2d 331, 338 (2d Cir. 1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977).

**36.** *United States v. Ong,* 541 F.2d 331, 338 (2d Cir. 1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977) ("Harmlessness is a relative term that requires specific definition in each case by determining the effect on the jury's verdict of the error's absence.").

**37.** *Cf. United States v. Keogh,* 289 F.Supp. 265, 273 (S.D.N.Y.1968), *aff'd,* 417 F.2d 885 (2d Cir. 1969).

**38.** T.R. at 1308 (emphasis supplied).

close, come on up.' And he came up." [39] Counsel then asked petitioner:

Q  Was anybody with him?

A  Yes, two fellows was with him.

Q  Tell me who they are?

A  It was McGill and Andy Mann.

Q  . . .  How long did they stay?

A  They couldn't have stayed more than five, six minutes because they had a drink and they left.

Q  . . .  [W]hat did they drink?

A  One asked for cold water and the other asked for something cold.

Q  . . .  [D]o you know where they came from?

A  No, there was no conversation where they had been.[40]

Thus Volpicelli cast their visit to his apartment so soon after the crime as a casual incidental social call of five or six minutes during which the robbers just had cold drinks. Under cross-examination, when Volpicelli denied that McGill or Mann had attache cases with them, a statement given by Volpicelli to the police on the day of the crime was admitted into evidence which, in contradiction to his trial testimony, stated that the two robbers had carried cases into his apartment.

Bearing in mind that Volpicelli, by his own words, gave "permission to take the car home but return it before 3:30" p. m. on September 11, it does seem somewhat odd, to say the least, that Myers would telephone Volpicelli so soon after the holdup at a point only a few blocks from the apartment, instead of going there directly and leaving the car. Indeed, Volpicelli's explanation under cross-examination that the reason he asked Myers to come to his apartment was because he "wanted to know what time [Myers] was bringing [the car] back" [41] borders on the absurd since he had

arranged the previous night for its return by 3:30 p. m.

And it is even more odd that the two men who were with Myers also happen to be the members of the robbery team. If Volpicelli had no role in or was not a member of the conspiracy, one may ask why robbers, who only forty-five minutes before had bound and gagged three victims and had the loot of the robbery in their possession, would stop to make a phone call to Volpicelli and then interrupt their activities for a social visit and a cold drink. Common sense suggests that if in fact Volpicelli had no part in their illicit activities, the robbers in possession of the recent, if not "hot," fruits of the crime and with holdup weapons still on their person would not have interrupted their mission by a social call to Volpicelli. Surely they would have sought some safe place to divide the cash and to arrange to fence the jewelry, rather than furnishing an innocent eyewitness to their possession of the fruits of the crime. The exculpatory testimony of petitioner as to the reason for the visit to the apartment and what transpired there not only taxes credulity but may be said to have "approached incredibility as a matter of law." [42] Volpicelli's testimony, against the totality of the evidence, was patently unbelievable.

Other evidence supports the compelling case against petitioner. For example, Virag testified that he had told Volpicelli in 1970 that he had previously been in the jewelry business. Furthermore, in his direct testimony, Volpicelli did not mention that he had known McGill and Mann prior to their visit to his apartment within an hour after the robbery. However, under cross-examination, he admitted that they had been to his home some weeks before and, after some further prodding, that he

---

**39.**  T.R. at 1309.

**40.**  T.R. at 1309–11.

**41.**  T.R. at 1369.

**42.**  *People v. Miles,* 23 N.Y.2d 527, 544, 297 N.Y.S.2d 913, 926, 245 N.E.2d 688, 697 (1969). *See United States v. Singleton,* 532 F.2d 199,

204 (2d Cir. 1976) (noting inherent incredibility of defendant's testimony); *United States v. Pui Kan Lam,* 483 F.2d 1202, 1208 (2d Cir. 1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1577, 39 L.Ed.2d 881 (1974); *United States v. Arcuri,* 405 F.2d 691, 695 (2d Cir. 1968), *cert. denied,* 395 U.S. 913, 89 S.Ct. 1760, 23 L.Ed.2d 227 (1969).

had met McGill and Mann even before that time at their hotel in New York City.

It is also significant that after the arrest of McGill and Mann, when Volpicelli went downstairs with Myers and the police questioned them, a policeman testified that Volpicelli stated that he had not seen Myers for two days. This was at variance with his trial testimony and that of a witness called on petitioner's behalf that Myers had been to his apartment the night before the crime was committed. The jury could readily find another instance of a false exculpatory statement.

Finally, the attack upon Myers permitted the prosecutor to introduce his confession made the very night of the holdup. At that time, seven hours after the holdup, he detailed his role and that of Volpicelli in the origination and execution of the robbery. Although Myers testified that the confession was given under duress, he nonetheless swore it was the truth as to events. Thus Myers' testimony as to Volpicelli's role did not come into being for the first time as part of the plea bargain arrangement made during the trial.

The conclusion that the admission of Taylor's testimony and the prosecutor's questions did not deprive petitioner of a fair trial and that any constitutional error in their admission was harmless error gains further support from another factor. The trial record shows that defense counsel was aggressive in defending petitioner's interests in a fair trial and made numerous objections and motions for mistrial during the course of the proceeding; yet counsel at no time during petitioner's cross-examination objected to a single question of the prosecutor on matters now claimed to infringe on petitioner's right to a fundamentally fair trial. So, too, when Detective Taylor was called as a rebuttal witness, counsel's sole objection was that some of the testimony was inadmissible on the ground that it involved collateral matters.[43]

While counsel's failure to object or move for a mistrial does not necessarily foreclose an attack based upon alleged constitutional infirmity,[44] it may properly be considered when subsequent to the trial the fundamental fairness of the trial is challenged.[45] Certainly counsel who was in the midst of the fray, had the feel of the case, and was a zealous advocate, was in the best position to assay whether his client's rights had been infringed. Petitioner's counsel was no novice; he had, according to his summation, served as an Assistant District Attorney for five years and for twelve years had been an active practitioner as defense counsel in criminal cases.[46]

Furthermore, when counsel did object to Taylor's testimony concerning the LoBosco murder, the court sustained the objection and expressly instructed the jury to disregard the testimony and ordered the prosecutor and the witness to avoid reference to crimes other than those charged in the in-

---

**43.** As counsel noted at the time, this objection was based on well-established state evidentiary rules. *See, e. g., People v. Schwartzman*, 24 N.Y.2d 241, 245, 299 N.Y.S.2d 817, 821, 247 N.E.2d 642, 644–645, *cert. denied*, 396 U.S. 846, 90 S.Ct. 103, 24 L.Ed.2d 96 (1969).

**44.** The State claims that petitioner's failure to object at trial waives his right to raise the issue here. However, it appears that under New York law, claims of deprivation of a fundamental constitutional right may be raised for the first time in the New York appellate courts. *See United States ex rel. Schaedel v. Follette*, 447 F.2d 1297, 1300 (2d Cir. 1971); *United States ex rel. Irons v. Montanye*, 520 F.2d 646, 648–49 (2d Cir. 1975); *People v. Arthur*, 22 N.Y.2d 325, 329, 292 N.Y.S.2d 663, 666, 239 N.E.2d 537, 539 (1968); *People v. Dugan*, 53 A.D.2d 507, 386 N.Y.S.2d 257 (1976). The claims asserted here are identical to others that have not been deemed waived for failure to object at trial. *See People v. Arthur, supra* (*Massiah*-type claim); *Ketchum v. Ward*, 422 F.Supp. 934, 944 (W.D.N.Y.1976), *aff'd with oral opinion*, 556 F.2d 557 (2d Cir. 1977) (prosecutorial misconduct). It would not be appropriate for this Court, since a constitutional violation is claimed, to apply a lower standard of waiver than New York itself applies.

**45.** *United States ex rel. Fernanders v. Fay*, 241 F.Supp. 51, 56 (S.D.N.Y.1965), *aff'd per curiam*, 359 F.2d 767 (2d Cir. 1966).

**46.** T.R. at 1482.

dictment for that case.[47] It is significant that counsel was satisfied with the court's instruction—indeed he mentioned it in his summation [48]—and that he did not move for a mistrial due to the presently claimed prejudicial nature of the testimony.[49]

Finally, the record does not support petitioner's claim of prosecutorial misconduct.[50] When the court, after objection from counsel, instructed the rebuttal witness to avoid collateral matters, the prosecutor cautioned the witness to excise from his testimony all matters other than "exactly what you said and what Volpicelli said with respect to this case." [51] Thus it is clear that the prosecutor sought to steer the witness away from inadmissible or prejudicial matter. This was no instance of the deliberate injection of irrelevant material by a prosecutor.

Furthermore, the witness sought to comply with the prosecutor's admonition. Evidently bearing in mind the cautionary instruction, the witness said: "I can't bring it up—he said he would see somebody for me. He told me who the person was. He said it was a captain in the Mafia in Nassau County." [52] Thereupon counsel again objected to the collateral nature of the testimony and the court once again instructed the jury to disregard the testimony.

Thus the volunteered reference by Taylor, made under some restraint, has been grossly exaggerated.[53] To permit this incident to void a judgment of conviction would mean that it was within the power of a witness, either through deliberateness or inadvertence, to abort a trial. To be sure we aspire to achieve perfect and errorless trials; but realistically we seek the unobtainable "so long as human beings conduct them." [54] The challenged questions and statements came at the end of a long trial, consisting of compelling direct and circumstantial evidence of petitioner's participation in the charged crimes. As the Supreme Court of the United States has recently stated:

> the prosecutor's remark . . . was but one moment in an extended trial and was followed by specific disapproving instructions. Although the process of constitutional line drawing in this regard is necessarily imprecise, we simply do not believe that this incident made respondent's trial so fundamentally unfair as to deny him due process.[55]

The Court is convinced that the interjection of references to "the mob" and the Mafia did not, in the context of this trial and viewed against the totality of the evidence, deprive petitioner of a fundamentally fair trial as to deny him due process of law. And any constitutional error that occurred in the admission of illegally seized

---

**47.** T.R. at 1407, 1410.

**48.** T.R. at 1487.

**49.** *See United States ex rel. Fernanders v. Fay,* 241 F.Supp. 51, 56 (S.D.N.Y.1965), *aff'd per curiam,* 359 F.2d 767 (2d Cir. 1966).

**50.** *Cf. Berger v. United States,* 295 U.S. 78, 84–89, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *United States ex rel. Washington v. Vincent,* 525 F.2d 262 (2d Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976).

**51.** T.R. at 1409. Another example of the prosecutor's concern that the trial be conducted properly and fairly occurs in the record. When defense counsel representing other defendants attempted to put into evidence various photographs, including a "mug shot" of Volpicelli, the prosecutor readily agreed with petitioner's counsel that the picture should not be admitted "because of the possible prejudicial affect [*sic*] against Volpicelli . . . .." T.R. at 570.

**52.** T.R. at 1410.

**53.** *Cf. United States ex rel. Fernanders v. Fay,* 241 F.Supp. 51, 56 (S.D.N.Y.1965), *aff'd per curiam,* 359 F.2d 767 (2d Cir. 1966).

**54.** *United States v. Kahaner,* 317 F.2d 459, 485 (2d Cir.), *cert. denied,* 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963).

**55.** *Donnelley v. DeChristoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974). *See United States v. Hyatt,* 565 F.2d 229, 233 (2d Cir. 1977):

> While [the challenged] questioning was both irrelevant to the proof at trial and prejudicial, we are not prepared to hold that it was sufficiently damaging, given the length of the trial and the relative paucity of offending material, to require reversal.

evidence was, beyond a reasonable doubt, harmless error. In sum, the Court is persuaded that even if the cross-examination of the defendant of his conversation with Taylor had been disallowed and Taylor's testimony on the same subject excluded, the total evidence as so refined would not have raised a reasonable doubt in the mind of a single juror—the jury verdict would have been the same.[56]

The petition is denied.

56. *See United States v. Ong,* 541 F.2d 331, 338 (2d Cir. 1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977).