Albert BAKER, Petitioner,

v.

Theodore C. REID, Superintendent,
Fishkill Correctional Facility,
Respondent.

No. 79 Civ. 4691.

United States District Court,
S. D. New York.

Nov. 13, 1979.

Albert Baker, pro se.

Robert Abrams, Atty. Gen., New York City, for respondent; Harriette G. Zelman, Deputy Asst. Atty. Gen., New York City, of counsel.

OPINION

EDWARD WEINFELD, District Judge.

Petitioner is now confined to the Fishkill Correctional Facility, New York State, serving a sentence of two to four years pursuant to a judgment of conviction, entered upon a jury verdict, of the crime of attempted burglary in the third degree. The same jury also found him guilty of the crimes of possession of burglar's tools and

criminal mischief in the fourth degree, and the sentence imposed on each charge was one year to run concurrently with one another and with the attempted burglary charge. The judgment of conviction was affirmed by the Appellate Division, Third Department in December 1978 and leave to appeal was denied on February 26, 1979.

In September 1979, the petitioner filed this application for a federal writ of habeas corpus seeking to void his judgment of conviction for alleged violations of his federally protected constitutional rights. In accordance with what has recently become a fairly common practice petitioner, in support of his claim for relief, has advanced the identical grounds, mostly alleged procedural and evidentiary errors, that were presented to the state appellate courts for a reversal of the judgment of conviction and has submitted the very brief filed with those courts in support of his contentions before this Court of violation of his constitutionally protected federal rights.

The claims here repeated in seeking to void the conviction are that (1) the evidence was insufficient to sustain the guilty verdict; (2) petitioner was denied a fair trial by prejudicial objections and comments upon the evidence by the District Attorney; (3) the court improperly commented upon the testimony and led witnesses to change their answers; (4) the prosecution inadequately attempted to locate and identify an informant known to the prosecutor whose testimony might have provided information helpful to the defense and failed to preserve the evidence of a person whose pres-

ence under the circumstances was exculpatory of him, in violation of *Brady v. Maryland*;[1] (5) the defendant upon his arrest was handled improperly; and (6) the court's instruction to the jury as to the lesser included offenses was erroneous.

■ The federal district courts are not appellate tribunals to review alleged errors in state court judgments of conviction.[2] Their jurisdiction is limited and derives from a prisoner's claim that his conviction was the result of the deprivation of his fundamental rights guaranteed to him by the Federal Constitution and is exercised when the claim has been fairly presented to and rejected by the state courts.[3]

■ Thus the district court is required to entertain a writ of habeas corpus on behalf of a person in custody pursuant to a state court conviction "*only* on the ground that he is in custody in violation of the Constitution or laws . . . of the United States" as set forth in 28 U.S.C., section 2254(a) (emphasis supplied). That is the source of the district court's jurisdiction to review state court convictions. Whether intended or not, the scope of that jurisdiction has been expanded by the Supreme Court's recent ruling in *Jackson v. Virginia*[4] that, despite a state appellate court's finding that the evidence was sufficient to sustain a guilty verdict, the ultimate decision as to whether the conviction satisfies federal constitutional law rests with the federal district court—in short, that whenever a state prisoner charges that his conviction rests upon insufficient evidence and, accordingly, he is held in custody in viola-

---

1. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (prosecutor's comments); *Malley v. Manson*, 547 F.2d 25 (2d Cir. 1976), *cert. denied*, 430 U.S. 918, 97 S.Ct. 1335, 51 L.Ed.2d 598 (1977); *United States ex rel. Castillo v. Fay*, 350 F.2d 400 (2d Cir. 1965), *cert. denied, sub nom. Castillo v. Fay*, 382 U.S. 1019, 86 S.Ct. 637, 15 L.Ed.2d 533 (1966); *Volpicelli v. Salamack*, 447 F.Supp. 652 (S.D.N.Y.), *aff'd*, 578 F.2d 1372 (2d Cir. 1978); *United States ex rel. Craft v. Lefevre*, 432 F.Supp. 93 (S.D.N.Y.1977); *see United States ex rel. Santiago v. Follette*, 298 F.Supp. 973, 974 (S.D.N.Y.

1969) ("[T]he writ of habeas corpus is not available to review errors in a state trial in the admission of evidence, alleged prejudicial statements in the Court's charge or in the prosecutor's summation absent a showing that they deprived defendant of a fundamentally fair trial." (citations omitted.))

3. *Cf. Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Johnson v. Metz*, 609 F.2d 1052. No. 74–329, slip op. (2d Cir. Nov. 7, 1979).

4. 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

tion of the Constitution or laws of the United States, the federal district court must consider whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt.[5] In practical effect, this rule constitutes the district courts as another level of direct appellate review of state court judgments of conviction. It is obvious that under the rule a state prisoner can automatically secure direct federal review of his conviction upon his mere allegation that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."

In the instant case, the pro se petitioner's claim that the evidence was insufficient to sustain the guilty verdict required this Court to make a word-by-word study of the more than 600 pages of the state trial record and appellate briefs in order to determine if the evidence indeed was sufficient to justify a rational trier of the facts to find guilt beyond a reasonable doubt. That study and review of the record establishes in essence the following:

*The People's Case*

At about 1:45 a. m. on March 16, 1977, a telephone call from a "Tony Smith" was received at the Schenectady police headquarters reporting that a burglary was in progress at Curley's Sweet Shop on Broadway in that city. Police officers, Colleton and Polak, hastened to the scene in a police car, and as they approached the Sweet Shop the car's spotlight was focused on the shop's side and then on the front door. Colleton saw in the entranceway of the front door an individual with his back toward him. The store door was open and the individual was in the doorway threshold with a tire iron in his right hand; upon seeing the spotlight, he turned around and Colleton observed the person whom he later identified as the petitioner. Petitioner darted out of the doorway, and ran into an alleyway adjacent to the building. Colleton stated to Polak, "There he goes out the front of the building." The car was immediately pulled into a lot on one side of the Sweet Shop and both officers exited from the car. Colleton ran down the same alleyway into which the individual had run and came across him standing on the top of a loading platform. Colleton yelled to him, "Halt, police officer"; but petitioner continued running and while running was observed by Colleton to throw down an object. Colleton continued to follow him up the loading platform and down the alley and found him hiding against a wall at which point he was placed under arrest at 1:50 a. m. On the way out of the alleyway with his prisoner, Colleton picked up from the ground the tire iron which he had first seen in petitioner's hand while he was at the Sweet Shop's door, and later observed him throw away, and two screw drivers that were next to it. Further evidence offered by the People established that upon examination at about 1:55 a. m., the front door of the Sweet Shop was ajar about two or three inches; that the door was broken; wood was missing from the door frame and the door had marks on it; and that pieces of the door frame were on the floor of the store's entrance.

*The Defendant's Case*

Petitioner testified on his own behalf. He denied that he was ever near the door of or that he had entered or broken into the Sweet Shop or had damaged any property there. He denied he intended to commit any burglary with the tire iron or the screw drivers. However, he did not deny he was in the vicinity of the store. He claimed that on the day in question he had a part-time job as a dishwasher and in addition that he collected junk scrap metal by driving around looking for junk and placing it in his car; he said that he would later sell the junk to a junk dealer. His version of events was that on March 15 at 11:00 p. m., he left his home in search of scrap metal; that at about 1:30 a. m., March 16, he parked his car about 100 yards from Curley's Sweet Shop; that when he left his car he was carrying his tire iron and two screw drivers; that he used the tire iron to break

**5.** *Id.* at 99 S.Ct. 2786.

wood on scrap metal since only the metal had salvage value; that he used the screw drivers to start his malfunctioning car, the larger one to make contact between the battery terminal to the cable and the smaller one to pry it up afterward to start the car; that at or about 1:50 or 2:00 a. m. as he headed towards Curley's Sweet Shop he looked into alleys for junk but found only a few pipes that he threw into the back of his car and then proceeded again toward the Sweet Shop store area and walked down the alley on the side of the store where he noticed "a lot of junk." Since the alleyway was wide enough for his car he decided to bring it there, and as he headed toward the sidewalk to get the car he noticed a "cop car" coming and he ran back toward the alley, through the alley around the garage and to the loading platform as far as he could; as he ran he dropped the screw drivers and tire iron and hid in a corner when Colleton the policeman came up, ordered him not to move and arrested him. He told the officer, "there was nobody with him" but the officer said he didn't believe him.

Thus a sharp issue of credibility was presented between the divergent versions of the People's witnesses and that of the defendant. It is clear that the jury, by its verdict, considered defendant's story that at about 1:30 a. m. he was in search of scrap metal in the area of the Sweet Shop; that the tire iron was used to separate wood from scrap metal and the screw drivers were needed to start his malfunctioning car, as a Baron Munchhausen tale. Viewing the record in the light most favorable to the prosecution, not only was a rational jury clearly justified in finding petitioner guilty beyond a reasonable doubt—but had the jury accepted the defendant's version,[6] characterized by his own lawyers as "a crazy story," one may question whether the fact finders could have been said to have acted rationally.[7]

This case justifies the deep concern expressed by Mr. Justice Stevens in his concurrence in *Jackson*[8] that the rule fashioned by the majority will open the floodgates of litigation to state prisoners[9] so that the federal courts will be inundated by numerous groundless claims of constitutional infirmity based on the "rational fact finder" concept, a result which will not only duplicate the work of the state appellate courts but is likely to "adversely affect the quality of justice administered by federal judges"[10] and "will be seriously harmful both to the State and Federal Judiciaries"[11] for the reasons set forth therein.

The other claims advanced by petitioner are also lacking in merit and only that

6. Apart from the direct evidence of the defendant's acts and conduct at or near the Sweet Shop at 1:50 a. m., the jury may not have been unmindful of the proverb, "The wicked flee when no man pursueth: but the righteous are bold as a lion." Proverbs 28:1.

7. The trial court, to assure the defendant of a fundamentally fair trial and to avoid prejudicial impact of defendant's prior criminal record, excluded testimony of two prior felony convictions one of which was a burglary charge on which he was on parole at the time of the instant charge.

8. *Jackson v. Virginia*, 443 U.S. 307, 326, 99 S.Ct. 2781, 2793, 61 L.Ed.2d 560 (1979) (Stevens, J. concurring in the judgment).

9. "During the year ended June 30, 1979, a total of 23,001 petitions were filed by federal and state prisoners. This level represents an all-time high, 43.8 percent greater than the number of petitions filed in 1970 and 4.9 percent over the number filed in 1978. *This overall increase is due solely to the increased filings by state prisoners, an increase of 9.0 percent over 1978.* The number of petitions filed by federal prisoners declined by 9.2 percent for the year ended June 30, 1979. The bulk of this increase in filings by state prisoners was in civil rights cases, which increased to 11,195 in 1979, 15.1 percent over the 1978 level and 451.5 percent over the number of civil rights petitions filed by state prisoners in 1970. State prisoners filed 80.4 percent of the total prisoner petitions filed in the district courts for the twelve month period ended June 30, 1979." Administrative Office of the United States Courts, Annual Report of the Director (1979) at 59. (emphasis supplied) *See id.* 59–62.

10. *Jackson v. Virginia*, 443 U.S. 307, 326, 99 S.Ct. 2781, 2793, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in the judgment).

11. *Id.* 443 U.S. at 335, 99 S.Ct. at 2798 (Stevens, J. concurring in the judgment).

which charges a violation of *Brady v. Maryland* requires discussion.

█ The essence of his claim here and as advanced before the State Appellate Division for reversal of conviction is that "the negligent investigation and recordkeeping on the part of the agencies resulted in the denial of a fair trial." This charge centers about two individuals. One is a "Tony Smith" whose name and address were recorded on a police record as the telephonic source of the report that a burglary was in progress at Curley's Sweet Shop. Police investigators made diligent efforts within five days thereafter to locate "Tony Smith" to subpoena him before the Grand Jury but without success; because "Tony Smith" was unknown at the address, the police ultimately concluded that no such person resided there. Nonetheless, the police renewed efforts to serve a subpoena to compel his appearance at the trial and again failed to locate him—indeed, the prosecution concluded that "Tony Smith" was a fictitious name.

Moreover, six months in advance of trial, on application of his attorney, petitioner was given "Tony Smith's" name and address as it appeared on police records and was in a position to exert his own efforts to locate the individual who, if found, could have been compelled to appear through court process. The defendant's mere assertion that the testimony of "Tony Smith" would have been of "critical importance" is sheer speculation.

The other person about whom petitioner's contention centers is unidentified. Petitioner alleges that following his arrest and while proceeding to police headquarters, the arresting officers encountered, and without getting out of the car, one of them questioned[12] a young white male pedestrian on Van Guysling Avenue in the vicinity where the crime occurred. In response the individual gave his name, address and the reason for his presence in the area at that hour of the morning, and the officers, satisfied with his answers, did not detain the individual nor did they record the interview. Since they were satisfied with his explanation and lacked probable cause to relate him to the crime and thereby detain, search or arrest him, there was no reason to record his name and address. The petitioner's allegation that the unidentified interrogated person "might have committed the crime," in this instance too, is the rankest speculation, without the slightest evidential support.

In sum, with respect to "Tony Smith" and the "unidentified person" there is no showing that the police had possession of, access to, or in any respect withheld, information from the defendant; but more important there is no showing that either one had any information which was material, exculpatory or in the slightest degree helpful to the defendant or might have affected the outcome of the case.[13] In each instance, not only is there no undisclosed information but as the Supreme Court noted, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not establish 'materiality' in the constitutional sense."[14] And finally, petitioner's claim that the police were negligent in failing to record the correct names and addresses of the purported witnesses, or to locate them, in the absence of proof that the police knew that any such persons had information exculpatory or helpful to the defense, presents no issue of constitutional dimension under *Brady*.

The petitioner further charges that the District Attorney repeatedly made prejudicial and improper objections, proffers of proof, and comments upon the evidence; that the court improperly commented upon testimony and led witnesses to change their answers; that the defendant upon his arrest was handled improperly and that the court's instruction as to a lesser included

---

12. One officer did not recall the incident.

13. *See United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

14. *Id.* at 109–10, 96 S.Ct. at 2400.

offense than that charged in the indictment was erroneous. This Court finds, upon review of the record and consideration of petitioner's brief in the Appellate Division, that, apart from the fact that alone or in totality the alleged errors do not constitute any violation of federal constitutional rights, they are so piddling and of a nit-picking nature as not to merit the dignity of discussion.

Accordingly, the petition for the issuance of a writ of habeas corpus is denied upon the merits.