Chief Judge Breitel.
Defendants appeal from their convictions for the murder of one prostitute and attempted murder of another. The motive was racial retribution, and all the persons involved were Blacks. Defendant Freeland was sentenced for 20 years to life and defendant McKnight for 25 years to life. The victims had been brutally beaten, strangled, and stabbed by two men who had picked them up at night in an automobile. The convictions rested on the testimony of the *522 woman who survived the assault. The Appellate Division unanimously affirmed, with opinion.
A major issue is whether the trial court improperly excluded, as collateral, certain hospital record evidence concerning the heroin addiction of the principal witness, Mrs. Stewart, by which the defense sought to impugn her ability to identify defendants. Among other issues raised were the propriety of identification procedures, the denial to the defense of access to police officers’ reports and notes, and whether the prosecution’s summation was excessive.
There should be a reversal, and remittal for a new trial. The additional evidence of the heroin addiction of the prosecution’s sole eyewitness, bearing on her ability to identify defendants, was improperly excluded.
On May 10, 1972, at about 12:30 Á.M., Orvetta Sanders Stewart and Stephonsa Washington were picked up on a Buffalo street corner by two men in a blue Buick Riviera with bucket seats. The passenger, who joined Stephonsa in the back seat, identified himself as "Bob”. The surviving witness, Orvetta, who sat next to the driver, "Eddie”, turned in her seat at times so that she could see both men. She was not acquainted with either man, but would later recall having seen "Eddie” a couple of years before selling a Black Muslim newspaper on a Buffalo street. The four drove for about 15 minutes through the lighted city streets, until they parked on Buell Street, a deadend.
The automobile was parked for about 10 minutes when Bob reviled the women for consorting with white men, voiced his disgust, and struck Stephonsa in the face. The witness Orvetta tried to reach for what she thought was a knife in an ashtray, and Eddie grabbed her hand. Bob was now strangling Stephonsa. Orvetta tried to open the door, but Eddie pulled her back by her coat, and struck the side of her face. Eddie started strangling Orvetta, who fainted. On regaining consciousness, Orvetta was in the street, suffering from a stab wound in the neck and other injuries. Stephonsa was later found on Buell Street, dead of strangulation.
Admitted to Meyer Memorial Hospital, Orvetta gave the police an initial description of the assailants. "Bob” was a "big guy”, "very tall”, about 30 years old, wearing a green parka coat with hood and boots, his hair in a "short bush”, and with a mustache. "Eddie” was about 5 feet, 10 inches in height, *523 with very large hands, wavy hair, and clean-shaven, wearing a black cashmere coat.
On May 12, Orvetta was shown 4 photographs, from which she picked out defendant Edward McKnight as the "Eddie” who had driven the car and attacked her. Subsequently, on May 26, Orvetta was shown a special album provided by the Federal Bureau of Investigation containing some 45 photographs of known Black Muslims. After viewing about 13 of the pictures, she selected a photograph of defendant Elverton Freeland as "Bob”. She also selected McKnight’s photograph from the album.
In the police procedure and events that ensued, Orvetta reaffirmed and strengthened her initial photographic identifications. Shown a photograph of McKnight again on June 1, she made a positive identification. About this time, Orvetta also believed that she had passed a man on the street whom she later identified as Elverton Freeland, and that the man recognized her and turned to stare at her. On June 26, having now seen photographs of Freeland at least three times, Orvetta viewed him alone in a station house through a one-way mirror. The next day, June 27, she identified both defendants in lineups.
After an identification hearing, the hearing court declined to suppress Orvetta’s identifications. The photographic album of Black Muslims, from which Orvetta made her identifications, was said to have been disassembled by the F.B.I., and could not be reconstructed or introduced either at the identification hearing or on the trial. Orvetta identified both Free-land and McKnight at trial, and her testimony was crucial and essential to the case for the prosecution.
Defendants Freeland and McKnight each testified in his own behalf. Freeland, a 43-year-old autoworker, veteran, and family man, had never been arrested or convicted for crime. He said he was a Black Muslim, and had known Edward McKnight casually as a member of the same Muslim mosque, but that he had not attended the mosque nor seen McKnight for a few years. His alibi was that he had celebrated a daughter’s birthday on the night of May 9, and had slept the rest of the night with his wife. They so testified. A coworker and a neighbor testified that they had never seen Freeland wear a mustache. He had never been called "Bob”.
Defendant McKnight, 29-year-old father of seven, and a bricklayer, also had no criminal record except for a juvenile *524 and youthful offender burglary history. He was unable to account for his time late on the night of May 9, but thought he had driven home a friend, Duane Woodward, earlier that evening. Woodward testified to this quasi-alibi defense.
Neither Freeland nor McKnight was found to have owned a Riviera with bucket seats. Indeed, the car Orvetta described was never found, nor, for that matter, were the clothes she said Freeland and McKnight wore at the time of the crimes.
The case was tried in July, 1973 and defendants were sentenced on September 4, 1973. On August 20 Orvetta had signed a recanting affidavit, presented on sentencing, to the effect that she was no longer sure that Freeland was the man in the back seat of the automobile, and that she had never been sure of his identification.
The court at the identification hearing, and also the Appellate Division in its review, found that Orvetta had ample opportunity to observe both defendants at the scene of the crimes, and thus that her identifications were based on an independent source untainted by any impermissibly suggestive police procedures (United States v Wade, 388 US 218, 241). Since there was evidence on the issue to support the fact-finding by the courts below, this court will not disturb this finding (e.g., People v Carter, 30 NY2d 279, 282-283).
That Orvetta had the opportunity to view her assailants, however, would not be conclusive for the finders of fact that she had the capacity to do so. Orvetta’s initial descriptions did not match either defendant, and was particularly discrepant as to Freeland. The suggestive identification procedures employed at the station house showup of Freeland six weeks after the crimes, preceded by the photographic identifications, make the issues of identification and capacity to identify critical ones. Under the circumstances, therefore, it was imperative that the jury be apprised of any competent evidence relevant to Orvetta’s ability to perceive and remember the perpetrators.
The defense sought to impeach Orvetta’s credibility by showing that at the time she witnessed the crimes, and when she later made photographic identifications, she was a drug addict. The hospital records received in evidence at trial were inconclusive and indeed contradictory on this point. An emergency room report of Meyer Memorial Hospital, dated April 14, 1972, a month before the crimes, described Orvetta as a "former” heroin addict, "now clean”. When, however, she was *525 admitted to the same hospital for stab wounds on May 10, 1972, terse notations on the admission form described her as a heroin addict and under the heading of "medication” bore the word "heroin??”.
The defense offered additional hospital records for periods prior to the crimes to show that Orvetta had a long history of heroin addiction, that by her own account in 1971 she had been on heroin since May, 1969; and notably, that she was still addicted when treated for a pelvic infection at Meyer Memorial between April 5 and April 11, 1972, a month before the crimes. The court excluded these records as collateral to the issues.
Generally, evidence of narcotic addiction is admissible to impeach a witness’ credibility if tending to show that she was under the influence of drugs while testifying, or at the time of the events to which she testified, or that her powers of perception or recollection, were actually impaired by the habit (see People v Webster, 139 NY 73, 86-87, involving a defense witness; People v Ortiz, 40 AD2d 857, 858; see, generally, Witness—Use of Drugs, Ann., 52 ALR2d 848, 849, 853-857; 2 Wharton’s Criminal Evidence [13th ed], § 459; cf. People v Williams, 6 NY2d 18, 28-29, discussing the testimonial use of experts on narcotism affecting general credibility). In such instances the collateral evidence rule is not applicable.
True, the May, 1972 hospital notations admitted in evidence did not show that Orvetta was under the influence of drugs at the time of the assaults and murder. Nevertheless, defendants were entitled, if they could, to show that Orvetta’s prolonged use of heroin had impaired her powers to observe and recall the events of May 10. The additional hospital records of less than a month before showing her addiction were therefore germane, and should not have been excluded.
First, as noted, the April and May, 1972 hospital records in evidence were contradictory on whether Orvetta was addicted at the time of the crimes. The statement in the emergency room report of April 14, 1972 that she was a former addict, now clean, may have been based on her own account. The evidence excluded would have shown that at the time of her release from the hospital only three days before, on April 11, she was still recorded as addicted.
Moreover, when Orvetta sought emergency treatment on April 14, she was suffering from severe headaches, high fever, stomach pains, nausea, and lapses of consciousness. If, per *526 haps, her condition resulted from narcotism or narcotic withdrawal it might well have had a bearing on her ability to perceive and recall the events of May 10, 1972.
Evidence of Orvetta’s heroin addiction on April 11, 1972, and its prior duration, was thus a foundation upon which to attack her testimonial capacity. Evidence of recent addiction established or clarified would bear on the state of a witness’ testimonial capacity (see People v Lubrien, 19 AD2d 641, 642; cf. People v Williams, 6 NY2d 18, 28-29, supra). Since the prosecution case rested largely, almost entirely, on the credibility of the one eyewitness, with troublesome antecedent identification procedures, the exclusion of the earlier hospital records was reversible error.
The other alleged errors raised by defendants were amply covered in the opinion at the Appellate Division, and further discussion is unnecessary.
Accordingly, the orders of the Appellate Division should be reversed, the convictions vacated, and a new trial ordered.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
In each case: Order reversed, etc.