Nicholas MYSHOLOWSKY,
Petitioner-Appellant,

v.

PEOPLE OF the STATE OF NEW
YORK, Respondent-Appellee.

No. 687, Docket 75–2141.

United States Court of Appeals,
Second Circuit.

Argued Feb. 10, 1976.
Decided May 6, 1976.

Sheila Ginsberg, The Legal Aid Society, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, on the brief), for petitioner-appellant.

Joan P. Scannell, Deputy Asst. Atty. Gen. of N. Y., New York City (Louis J. Lefkowitz, Atty. Gen. of N. Y., and Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, on the brief), for respondent-appellee.

Before LUMBARD and TIMBERS, Circuit Judges, and BRYAN,* District Judge.

LUMBARD, Circuit Judge:

Two decades after his conviction in Queens County Court, New York, for robbery, grand larceny, and assault, Nicholas Mysholowsky filed a petition for a writ of habeas corpus in the Eastern District of New York pursuant to 28 U.S.C. § 2254 alleging that the procedures employed to procure a pretrial identification deprived him of his Fourteenth Amendment right to

* Sitting by designation.

due process of law.[1] Mysholowsky now appeals from an order in which Judge Costantino found no constitutional violation and denied the petition. We find no substantial likelihood that Mysholowsky was irreparably misidentified and therefore affirm the denial of the writ.

Appellant was convicted in 1954 for a robbery that occurred in Long Island City on September 22, 1953. At approximately 10:30 a. m. on that date, Julia Tully, a bookkeeper for Adams Industries, returned to her place of employment with a payroll that she had obtained from the National City Bank. Her husband drove Mrs. Tully from the bank to the plant and waited in their car while Mrs. Tully rang for the freight elevator. While Mrs. Tully waited for the elevator, she was joined by a man who was later identified as Mysholowsky. When the elevator arrived, about 45 seconds later, Mrs. Tully remained on the sidewalk because she would not ride the elevator with strangers. The man who had joined Mrs. Tully, however, entered the elevator and requested the second floor. The elevator operator, Santorico, explained to the man that he could not ride the freight elevator, whereupon the man drew a gun and ordered Santorico and Mrs. Tully into the elevator. He then demanded that Mrs. Tully throw down the envelope containing the payroll, picked up the envelope, and commanded Santorico to close the elevator doors. The robbery lasted about 38 seconds.

When Mr. Tully, who remained in his car about 20 feet away, observed his wife being pushed into the elevator, he attempted to aid her but was restrained at gunpoint by a second man, later identified as petitioner's codefendant, Sadowy, who also demanded Mr. Tully's car keys. The second gunman then ran to a car parked 50 feet in front of the Tullys' car. Immediately thereafter, the man identified as Mysholowsky entered Mr. Tully's car, apparently in the belief that it was his accomplice's, and ordered Tully to "get going." When Mr. Tully replied that he could not move the car because he had surrendered the keys, the man realized his mistake and ran to the car parked ahead. That car was then driven away.

Attempts to identify the robbers began that afternoon. The Tullys viewed numerous photographs at the Manhattan Bureau of Criminal Identification. Although appellant's photograph was in the files that were viewed, the Tullys did not identify him as the robber. Rather they jointly chose photographs of three other persons who allegedly bore similarities to the robber. The pictures selected all depicted a man with a round face and heavy build.

Approximately three weeks after the robbery, Detective McCarthy visited Mrs. Tully and exhibited to her a single photograph of Mysholowsky which had been taken in 1938. Mrs. Tully stated that the man pictured was too young to have been the robber. A few days later, detectives exhibited a more recent picture of appellant—taken in 1952—to Mrs. Tully. Again, she was shown only the single photograph rather than a spread or pile of photographs of similarly-built persons.[2] Mrs. Tully stated that the man in the photo resembled the robber but was somewhat thinner and she "still would like to see the man."

Two or three days later, both Mr. and Mrs. Tully were shown the recent photograph of appellant. Mrs. Tully conceded that she and her husband had discussed her tentative identification of the man in the picture and, when shown the photograph in a spread at the police station, she picked out Mysholowsky's picture and reiterated, "I feel as though that could be the man." Mr. Tully was specifically asked if he recognized

1. The petition for habeas corpus was originally brought in the Middle District of Pennsylvania, where Mysholowsky was incarcerated for an unrelated crime. The petition was transferred to the Eastern District of New York on May 2, 1975.

2. The same photograph of petitioner was also displayed to Santorico along with approximately twenty other pictures. Santorico failed to pick out any of the photographs as being one of the robber.

Mysholowsky and replied that there was a similarity but that the robber had been heavier.

On October 22, 1953, one month after the robbery, Mysholowsky was placed in a line-up and was identified as the robber by each of the Tullys and by Santorico. Each of these witnesses viewed the line-up separately and without prior consultation with the other witnesses. All participants in the line-up were of similar height and weight and all wore similar clothing.

The Tullys and Santorico testified at the trial that commenced on April 7, 1954 concerning the facts recited above. All three eyewitnesses made in-court identifications of appellant as the robber, although Santorico's description of the assailant in the courtroom contained far more detail than he had been able to give to the police after the robbery. When asked specifically if she had selected appellant at the line-up because she had recently seen his picture, Mrs. Tully candidly replied that she did not think so. With equal candor, when asked if it were possible that she was influenced by her earlier exposure to the photographs, Mrs. Tully admitted that she did not know but that she believed that she had recognized him immediately upon seeing him in the line-up.

Mysholowsky took the stand on his own behalf and submitted an alibi that was supported by his relatives and a friend. The jury deliberated for approximately ten hours before convicting appellant and his codefendant on charges of robbery, grand larceny, and assault.[3] The Appellate Division of the State of New York affirmed the conviction without opinion and the New York Court of Appeals denied leave to appeal on September 17, 1956.[4]

## DISCUSSION

The photographic identifications and line-up challenged in this case were conducted long before the Supreme Court issued its decisions in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) and therefore convictions based on those identifications will be set aside only if the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968), or were "so unnecessarily suggestive and conducive to irreparable mistaken identification" that appellant was denied due process of law, *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967).[5]

---

**3.** Appellant was sentenced to concurrent terms of no less than fifteen years nor more than thirty years on the robbery conviction, not less than five nor more than ten years on the grand larceny conviction, and not less than two and one-half nor more than five years on the assault convictions. He was released from prison in 1969 subject to the supervision of the New York State Parole Board. In 1971, appellant was sentenced to a federal penitentiary following a plea of guilty to bank robbery, 18 U.S.C. § 2113(b). A New York State parole violation warrant was issued against appellant as a result of his federal conviction and institution of the habeas corpus petition followed.

**4.** At oral argument we expressed some doubt as to whether Mysholowsky had fully presented his constitutional claim to the state courts in compliance with the exhaustion requirement of 28 U.S.C. § 2254(b). See *Cameron v. Fastoff*, Docket No. 75–2073 (2d Cir. April 22, 1976); slip op. 3369. While there remains some doubt on the question of exhaustion, in light of the

fact that the state has never raised the issue, see *Brathwaite v. Manson*, 527 F.2d 363, 366 (2d Cir. 1975), cert. granted, —— U.S. ——, 96 S.Ct. 1737, 48 L.Ed.2d 202, 44 U.S.L.W. 3620 (U.S. May 4, 1976), and the extended period of time over which litigation of Mysholowsky's conviction has occurred, we think it unnecessary to consider the question and we rest our decision on the merits of petitioner's claim. See *United States ex rel. Smith v. Montanye*, 505 F.2d 1355, 1358–59 (2d Cir. 1974), cert. denied, 423 U.S. 856, 96 S.Ct. 106, 46 L.Ed.2d 81 (1975).

**5.** Under Rule 9(a) of the Proposed Rules Governing Habeas Corpus Proceedings, Mysholowsky would have the additional burden of demonstrating that his petition for habeas corpus, which was filed more than five years after the imposition of sentence, was based on grounds of which he neither had nor reasonably could have had earlier knowledge. Failure to satisfy this burden would enable the district court to dismiss the petition for prejudicial delay in bringing the action. The Proposed Rules, spon-

█ We have previously disapproved certain of the practices employed here to elicit a pretrial identification of a suspect. We have consistently condemned the exhibition of a single photograph as a suggestive practice, and, where no extenuating circumstances justify the procedure, as an unnecessarily suggestive one. See *United States ex rel. John v. Casscles*, 489 F.2d 20 (2d Cir. 1973), cert. denied, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974); *United States v. Reid*, 517 F.2d 953, 966 (2d Cir. 1975); *United States ex rel. Gonzalez v. Zelker*, 477 F.2d 797, 801 (2d Cir. 1973), cert. denied, 414 U.S. 924, 94 S.Ct. 254, 38 L.Ed.2d 158 (1974). Repeating the exhibition to Mrs. Tully shortly before submitting Mysholowsky to a line-up could only have exacerbated the suggestive nature of the single photograph. Furthermore, the selection of appellant's photograph from a spread displayed to Mr. Tully and the request of Mr. Tully whether he recognized that picture may have made as great an impression on the witness' mind as did his brief encounter with Mysholowsky during the robbery. See *United States ex rel. Phipps v. Follette*, 428 F.2d 912, 915 (2d Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970).

Notwithstanding the presence of unnecessary suggestiveness, in the totality of circumstances with which we are faced, *Stovall v. Denno*, supra, 388 U.S. at 302, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206, we find that the procedures employed would not give rise to a very substantial likelihood of misidentification. The Supreme Court has outlined several of the factors to be considered in evaluating the possibility of misidentification:

"the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

*Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972). As applied to this case, we find these factors indicate that the testimony regarding identification of Mysholowsky was sufficiently reliable for consideration by the jury.

All three eyewitnesses viewed the robber during daylight hours and at very close range. The length of time during which the victims of the robbery, Santorico and Mrs. Tully, could observe their assailant was well within the period that we have previously considered as sufficient to support a reliable identification.[6] Mrs. Tully stood alongside the robber for about 45 seconds while awaiting the elevator. She was suspicious enough of strangers to avoid riding on the elevator with them, and thus she would have observed the robber during this period more closely than had she been an uninterested bystander. See *United States ex rel. Gonzalez v. Zelker*, supra, 477 F.2d at 801; *United States ex rel. Phipps v. Follette*, supra, 428 F.2d at 915. During the 35–40 seconds that the actual robbery occurred, both Mrs. Tully and Santorico had an even greater reason to scrutinize the robber's image.

Appellant seeks to make much of the discrepancies between the witnesses' descriptions of the robber immediately after the crime and his appearance one month later at the line-up. The Tullys originally described the robber as five feet eight to ten inches tall and weighing 160 to 180 pounds. When apprehended, however, appellant weighed 212 pounds. Appellant argues that this variation demonstrates the inaccuracy of the later identifications. This

sored by the Advisory Committee on Criminal Rules to the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, were submitted to Congress by the Supreme Court on April 26, 1976, pursuant to 28 U.S.C. § 2072. See 44 U.S.L.W. 4551, 4553 (U.S. April 27, 1976).

6. See *United States v. Yanishefsky*, 500 F.2d 1327 (2d Cir. 1974) (observer had only a "fleeting glance" of a "side face"); *United States ex rel. Cummings v. Zelker*, 455 F.2d 714 (2d Cir. 1972) (burglary victim viewed perpetrator of crime for 15 seconds); *United States ex rel. Phipps v. Follette*, supra (prospective victim of assault viewed burglar for 20 to 30 seconds).

argument, however, may prove too much; both Mr. and Mrs. Tully were reluctant to identify the robber from the 1952 photograph because the person pictured—Mysholowsky—was too thin. Furthermore, Santorico had described the robber to the police as "heavy-set." In short, it is clear that the witnesses were looking for a stocky individual and recognized him upon viewing Mysholowsky in the line-up. The jury may well have believed the plausible explanation that the witnesses' powers of observation were greater than their powers of description.

The level of certainty demonstrated by the witnesses at the line-up also supports the inference that their identification of Mysholowsky was not prompted by the prior exhibition of photographs. Mrs. Tully stated that she recognized him immediately and, at trial, all three witnesses testified that they were "positive" of their identifications, a factor that we have previously considered in determining the trustworthiness of an identification. See *United States ex rel. Gonzalez v. Zelker,* supra, 477 F.2d at 802; *United States ex rel. Phipps v. Follette,* supra, 428 F.2d at 916. This degree of certainty stands in marked contrast to the reluctance of any of the witnesses to make a positive identification on the basis of the photographs and thus decreases the possibility that the photographs influenced the later identifications. Cf. *United States ex rel. Pella v. Reid,* 527 F.2d 380 (2d Cir. 1975). Furthermore, Santorico's positive line-up identification and in-court identification were not preceded by any suggestive photographic exhibit to him. See note 2 supra.

Finally we note that counsel for appellant cross-examined the witnesses at length concerning their pretrial identifications and sought to develop the possibility that they had been unduly influenced by those procedures. Thus the jury was adequately advised so that it could determine the weight it should give to those identifications and to the effect of the pretrial photo exhibits and the line-up on the in-court identifications. See *Neil v. Biggers,* supra, 409 U.S. at 200, 93 S.Ct. at 382, 34 L.Ed.2d at 411; *Simmons*

*v. United States,* supra, 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253; *United States v. Yanishefsky,* 500 F.2d 1327, 1331 (2d Cir. 1974). In view of all the circumstances, we find no reason to disturb the jury's determination. The procedures employed in this case were not so conducive to a very substantial likelihood of irreparable misidentification as to deprive appellant of due process.

Affirmed.