**Charles MONTGOMERY, Petitioner,**

v.

**Walter J. FOGG, Superintendent, Eastern Correctional Facility, Respondent.**

**No. 79 Civ. 2626.**

United States District Court, S. D. New York.

Oct. 16, 1979.

---

364

Charles Montgomery, pro se.

Robert M. Morgenthau, Dist. Atty., New York County, New York City, for respondent; Robert M. Pitler, Gregory L. Waples, Asst. Dist. Attys., New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Petitioner, Charles Montgomery, now serving a sentence of twenty years to life imposed pursuant to a judgment of conviction for murder in the second degree entered on October 31, 1975, upon a jury verdict in the Supreme Court of the State of New York, seeks his release upon a federal writ of habeas corpus. The judgment of conviction was affirmed by the Appellate Division First Department on April 27, 1978, and leave to appeal to the Court of Appeals was denied on May 26, 1978. The instant application is based upon the alleged denial of petitioner's right to due process of law, in that he was denied: (1) a *Wade* hearing,[1] (2) the right to confront and cross-examine the medical examiners who conducted an autopsy of the murder victim, (3) a fair trial because the prosecution in summation argued matters that were without

---

1. *See United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

evidentiary support in the trial record, and, finally (4) in that his guilt was not proved beyond a reasonable doubt.

The evidence presented upon the trial established:[2] that petitioner and two others, Andrew Sullivan[3] and an unidentified masked male[4] entered a dry cleaning store located at 2590 Eighth Avenue, New York City on February 8, 1974, at about 6:00 p.m. Each was armed; petitioner had a single barrel shotgun. The front portion of the store was where customers presented their materials for cleaning and obtained their return; the middle portion was used for pressing and dry cleaning operations; and the rear portion was an office, entry to which was through a locked door.

Announcing a stickup, Sullivan held up two store employees and a customer in the front part of the store. Montgomery and the unidentified third man, who was wearing a mask, went directly to the middle portion of the store where they encountered Charles Cooper, another employee. Montgomery was wearing a leather hat that was down over his forehead, but his face was otherwise uncovered and visible. The masked robber announced a "stickup." Cooper resisted, hitting Montgomery's accomplice and knocking him to the ground. Montgomery shoved his shotgun against Cooper's head, saying, "This is for real." Montgomery then took $40 from Cooper's pocket and a watch from his wrist. The assailants then announced they wanted to get into the back room where Lindsay the owner was, but the door was locked. After an unsuccessful attempt to gain entry through a buzzer signal, the masked man threatened to kill Cooper who then pounded on the door and pleaded with Lindsay to open it, yelling, "They're going to kill me." When Lindsay did not respond, the masked robber fired two rounds from his .38 gun at

the lock. A bullet fragment ricocheted and struck Cooper's finger. Lindsay then opened the door slightly; upon seeing the armed masked man, he started to slam it shut, but while the door was still slightly ajar, the masked assailant shot point blank at Lindsay through the slight opening. Cooper was then forced at gunpoint by the two holdup men to batter down the locked door with his shoulder. Upon entry, they found Lindsay lying in a pool of blood with a bullet in his head. Placing his shotgun against Cooper's head, Montgomery forced Cooper to kneel in front of a bed in the rear of the room; he wrenched a class ring off Cooper's finger and tried to pull off his wedding band. When Cooper protested, Montgomery replied that, "The way it looked like you might not live to see another wedding day." Montgomery searched the office and found $1.00. The assailants engaged in a discussion with Cooper about the location of a telephone. He was told to remain on his knees whereupon Montgomery, Sullivan and the unidentified accomplice fled from the store. Lindsay was taken to a hospital where he died eight days later on February 16, 1974.

The foregoing was the substance of Cooper's testimony as to what transpired in the middle and rear portions of the store. At the trial, Cooper made a positive identification of Montgomery as the one who carried the shotgun during the robbery.[5] He testified that all the lights were on in the premises and that he had no problem seeing. He estimated that about five minutes had elapsed from the time the two men entered the middle portion of the store until they left. He further testified that about a week or two after Lindsay died, Montgomery appeared at the dry cleaning store where Ronald Frazier, whose sister had

---

2. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Kahaner*, 317 F.2d 459, 467 (2d Cir. 1963).

3. Andrew Sullivan was a juvenile at the time of the murder. Proceedings against him were conducted in the Family Court.

4. The third participant was not apprehended.

5. Two female employees who were held up in the front and who did not observe what went on in the middle and rear portions of the store made no identification of petitioner. Two customers who were in front of the store when the robbers entered fled immediately and were never identified.

been in the rear room with Lindsay at the time of the shooting, asked Cooper if he knew Montgomery, whose name he announced as Bucky. Montgomery then "said something about he wasn't there at the time this took place. Was he the guy?". Cooper testified that as he was "looking at him [Montgomery] and he [Montgomery] was looking at him [Cooper]," he recognized Montgomery as the man who put the shotgun to his head. He further testified that he was scared. He left the premises and immediately telephoned the police and informed them of the situation and returned to the store where Montgomery still was present. Three homicide detectives responded to his call. Upon their arrival, the detectives inquired if Montgomery was still around; Cooper said, "No," because he was still scared.

Cooper further testified that three or four days later, he again saw Montgomery at a corner standing with some fellows, and upon recognizing him as the man who put the shotgun to his head on February 8, Cooper promptly notified the police that he had seen Montgomery and told them the location. Thus, on three occasions subsequent to the robbery Cooper unequivocally identified Montgomery as one of the robbers: the first about two weeks after the holdup; the second, within four days thereafter; and, finally, upon the trial. No evidence was presented by the defense.

The first challenge to conviction is based upon the denial of a *Wade* hearing. Prior to the trial, petitioner's counsel moved for a *Wade* hearing;[6] the motion was returnable in the calendar part and was referred by the calendar judge to the trial judge for disposition. The case was called exactly one year after the motion was made. Defense counsel failed to renew the motion either at the start, or at any time during the progress, of the trial. There is nothing

in the record to indicate that the motion was ever presented to the trial judge, or that his attention had been called to any application for a *Wade* hearing.

During the course of the trial one of the female employees who was in the front part of the store testified upon cross-examination that Cooper told her he had identified Montgomery; she added, "He saw pictures, I presume." No further inquiry was made of her on the subject. Thereafter, Cooper testified. Despite the prior testimony about pictures, defense counsel failed to renew the *Wade* motion;[7] failed to cross-examine Cooper about the pictures; and failed to request that his in-court identification testimony be stricken as the product of suggestive police practices. It was not until the conclusion of the People's case, when petitioner's counsel, in moving to dismiss the indictment on the ground that the prosecution had failed to establish beyond a reasonable doubt the elements of the crime charged, first raised the further ground that the court had refused to permit a *Wade* hearing prior to trial. His application made no mention of the picture array to which the witness had alluded. The motion was denied.

Upon appeal, however, petitioner's counsel sought to revive the issue. In oral argument before the Appellate Division he evidently raised the matter; both counsel were directed to present their contentions by way of letters as supplements to their briefs. Petitioner's appellate counsel referred to the motion that had been made prior to trial to suppress Cooper's identification testimony on the ground "that it may have been the product of suggestive police procedures"; that "Cooper, the only witness who recognized appellant as one of the robbers, may have viewed a photographic array in connection with his identification of appel-

6. *See* N.Y.Crim.Proc.Law § 710.20(5) (McKinney's 1978).

7. A motion to suppress identification improperly obtained "may be made for the first time during trial when, owing to previous unawareness of facts constituting the basis thereof . . . the defendant did not have reasonable opportu-

nity to make the motion before trial, or when [notice of an intention to offer] evidence which he seeks to suppress . . . was not served by the people . . . ." N.Y.Crim.Proc.Law § 710.40(2) (McKinney's 1971). *See also id.* §§ 710.40(4); 710.60(5).

lant." In this same communication to the Appellate Division he also noted that in preparing the appeal the Assistant District Attorney had assured him that no pre-trial identification procedures had been used; that on the day of the argument of the appeal the Assistant informed him for the first time that Cooper had viewed photos in connection with his identification of appellant. Other than the foregoing no claim was made that in fact Cooper's identification was the product of suggestive pre-trial practices. Petitioner's counsel urged the Appellate Division to hold in abeyance determination of the appeal and to return the matter to the trial court for a hearing upon the admissibility of the identification evidence against defendant at his trial.

In opposing petitioner's application the state stressed that the record failed to show that the motion for a *Wade* hearing had ever been called to the trial court's attention apart from the reference made by counsel in his motion for dismissal after the state had offered its testimony and rested. In addition, the state contended that, even assuming the original motion had been revived and called to the trial court's attention, the affidavit upon which it was based was legally insufficient because it failed to set forth any factual allegation of unconstitutional identification procedures that would taint and render inadmissible Cooper's two unequivocal identifications prior to the courtroom identification; and further that there was no allegation of any improper police conduct.[8] After receipt of these supplemental briefs the Appellate Division affirmed without opinion.

After a searching review of the record, the Court concludes that the defendant waived his objection to any photographic array that might have been conducted. New York law requires the movant who wishes to suppress identification testimony to state the particular grounds of his objection.[9] The affidavit of petitioner in support of his *Wade* motion makes no mention of a photo array.[10] The petitioner contends, however, that he could not be expected to challenge the photo array before trial, because at that time he had no knowledge that photos had been used as an aid in identification.[11]

Even if this argument is accepted, it does not excuse the fact that petitioner's counsel failed to renew his *Wade* motion at the start of the trial, when he could and should have pressed for a ruling on the issue. Moreover, when he first learned at the trial of the existence of a photo array, many avenues of objection were still open to him. He could have renewed his objection and requested a hearing outside the presence of the jury.[12] Alternatively, he could have cross-examined the witnesses at length about any suggestive practices by which they might have been improperly influenced.[13] He could have moved to strike all

---

8. See N.Y.Crim.Proc. Law § 710.60(3) (McKinney's 1971):

> The court may summarily deny the motion if: (a) The motion papers do not allege a ground constituting legal basis for the motion; or (b) The sworn allegations of fact do not as a matter of law support the ground alleged . . . .

> The affidavit of defense counsel in support of the motion for a *Wade* hearing stated:
> The defendant has also informed your affirmant that there is a serious question of his identification, since he claims a failure to identify him when he voluntarily appeared at the alleged location of the alleged crimes. A hearing in that respect is therefore respectfully requested at least 30 days before the trial.

9. *See* N.Y.Crim.Proc.Law § 710.60(3) and (5) (McKinney's 1971).

10. *See* note 8 *supra.*

11. It has long been established that it is not improper for the police to conduct photo arrays outside the presence of the defendant or his attorney. *See, e. g., United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973); *United States ex rel. Pella v. Reid*, 527 F.2d 380, 384 (2d Cir. 1975); *United States ex rel. Johnson v. Department of Cor. Serv.*, 461 F.2d 956, 959 (2d Cir. 1972).

12. *See* note 7 *supra.*

13. *See Mysholowsky v. People of State of N. Y.*, 535 F.2d 194, 198 (2d Cir. 1976); *Howard v. Olgiati*, 435 F.Supp. 886, 890 (W.D.N.Y.1977).

identification testimony as improperly obtained.[14] Finally, he could have pressed the issue of identification before the jury.[15] The very fact that none of these actions was taken is a strong indication that there was no basis for any claim of impermissible practices. When he moved for dismissal at the end of the People's case, he failed to mention the photo array. Indeed, the whole thrust of his objection was directed at the live identifications of Montgomery made by Cooper in the store and on the street. The trial court properly denied this motion, because this kind of identification, which is not arranged by police officers, is not entitled to the protections afforded by *Wade*.[16] By failing to raise the issue of photographic identification at the trial, and only belatedly raising it on appeal—and even then, only orally, upon argument—the petitioner is deemed under New York law to have waived his objection.[17] Accordingly, he may not now raise the issue in his habeas petition.[18]

■ Even now, in his habeas application, Montgomery offers no more than the bare assertion that a photo display was conducted at some point, and that he might have been prejudiced by it. Although he has the benefit of an investigative report, he sets forth none of the circumstances surrounding the event, and alleges no actual prejudice to his defense. Ironically, the one reference he makes to the photo display does not aid his claim. Petitioner's court-appointed investigator evidently rendered a report which stated, in part, "[S]everal days later they brought Cooper several pictures to look at. He picked out [petitioner's] picture but told them he was the one who prevented the man with the .38 from killing him."[19] If anything, this information underscores the verity of Cooper's identification testimony. At most, the petitioner has claimed only that the photo array caused "speculative prejudice," which is not a ground upon which habeas corpus relief may be granted.[20]

■ Apart from the petitioner's procedural default, and his failure to show prejudice to his case, there are other, more substantial reasons to reject his claim that the lack of a *Wade* hearing invalidated his trial. A word-by-word reading of the trial record abundantly establishes that Cooper had the capacity and opportunity to observe his assailant at the time of the robbery over a five-minute period.[21] He also heard petitioner speak during the holdup and again when he made his appearance at the store a week or two thereafter. Cooper's positive identification of petitioner at the trial was based upon his observation of him during the five-minute ordeal during the robbery

14. *See United States v. Madison*, 458 F.2d 974, 975 (2d Cir. 1972).

15. *See United States ex rel. Johnson v. Department of Cor. Serv.*, 461 F.2d 956, 959 n.5 (2d Cir. 1972).

16. *Cf. Kirby v. Illinois*, 406 U.S. 682, 688–90, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (*Wade* protections do not apply to pre-indictment lineups arranged by police).

17. *See, e. g., People v. Ross*, 21 N.Y.2d 258, 262–63, 287 N.Y.S.2d 376, 379–80, 234 N.E.2d 427, 428–429 (1967); *People v. Clayborn*, 50 A.D.2d 952, 376 N.Y.S.2d 208, 211 (3d Dep't 1975); *People ex rel. Balbot v. Denno*, 28 A.D.2d 919, 282 N.Y.S.2d 33, 35 (2d Dep't 1967); *People v. Britton*, 26 A.D.2d 586, 271 N.Y.S.2d 1010 (2d Dep't 1966), *cert. denied, Britton v. New York*, 386 U.S. 935, 87 S.Ct. 963, 17 L.Ed.2d 808 (1967).

18. *See, e. g., LiPuma v. Commissioner, Department of Cor.*, 560 F.2d 84, 89–90 (2d Cir.), *cert.*

*denied*, 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 135 (1977); *United States ex rel. Tarallo v. LaVallee*, 433 F.2d 4, 6–7 (2d Cir. 1970), *cert. denied*, 403 U.S. 919, 91 S.Ct. 2235, 29 L.Ed.2d 697 (1971); *Howard v. Olgiati*, 435 F.Supp. 886, 890 (W.D.N.Y.1977). *Cf. Wainwright v. Sykes*, 433 U.S. 72, 86–87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

19. Petitioner has submitted only a portion of this report, and no date is reflected thereon.

20. *See United States v. Mojica*, 442 F.2d 920, 921 (2d Cir. 1971) (citing cases).

21. Much briefer periods of observation have been deemed sufficient time within which a witness may form a lasting impression of the defendant's features. *See Mysholowsky v. People of State of N. Y.*, 535 F.2d 194, 197 & n.6 (2d Cir. 1976) (citing cases).

when his life was threatened, and on separate occasions subsequent to the holdup, when again there was ample opportunity for observation. In each instance, Cooper's trial testimony was direct and positive. The petitioner does not now allege, and indeed there can be no basis for any such allegation, that Cooper's testimony was the product of impermissibly suggestive police procedure.[22] Cooper was alone with Montgomery and the unknown man at the time of the robbery in both the middle room and the rear room; except for Ronald Frazier, he was alone with petitioner a few weeks after the robbery when Cooper called the detectives to inform them that Montgomery was the holdup man; he was alone when he observed Montgomery on the street four days later and again notified the authorities. There were no police officers present on these occasions. There was no one to implant impermissible suggestions in Cooper's mind.

█ The petitioner presses that Cooper's denial at the time of the detectives' appearance at the store in response to his call casts doubt upon the reliability of his identification at the trial. However, this disregards the setting and the circumstances of the denial, which Cooper readily acknowledged upon the trial. He testified that his denial was prompted by fear: initially, when he came face-to-face with petitioner who, after first stating he was not "at the place when this happened," then asked Cooper, "Was he the guy?"; and later, when he said to the detectives who responded to his call that petitioner was not present although, in fact, he was in the store. Petitioner's unex-

plained appearance at the store, his statement that he was not present "when this happened," and his question, "Was he the guy?" need no elaboration as to their ominous and threatening nature. Moreover, the force of Cooper's identification is underscored by his next identification four days later when he observed petitioner and promptly called the police; sometime thereafter, petitioner was arrested. In any event, the reliability of Cooper's testimony, including the denial, was for the jury to determine. Its verdict was fully warranted on the strength of Cooper's testimony which was unequivocal.[23] The evidence of identification was so substantial that it compels the conclusion that even if the failure to afford petitioner a *Wade* hearing was error, it was harmless beyond a reasonable doubt.[24]

Petitioner next contends that the receipt in evidence of the autopsy report based upon the testimony of a medical examiner who was not present at and did not participate in the autopsy violated his Sixth Amendment right of confrontation. James Lindsay, the victim of the robbery, died eight days after a .38 calibre bullet crashed through his skull and shattered his brain. Three medical examiners performed or participated in the autopsy and wrote the findings which certified the cause of Linday's death as a bullet wound of the head and brain. At the time of trial, two of the three doctors no longer were associated with the medical examiner's office and the third was on vacation. Another medical examiner, who was not present at the autopsy but who had performed over 2,750

---

22. Compare *People v. Freeland*, 36 N.Y.2d 518, 369 N.Y.S.2d 649, 330 N.E.2d 611 (1975); *United States v. Wade*, 388 U.S. 218, 241, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

23. Cooper's opportunity to observe the petitioner prior to his apprehension was so ample, and his trial testimony so unequivocal, that there can be no serious doubt that he correctly identified Montgomery. The use of a suggestive photo array does not compel the reversal of a criminal conviction unless the array created a substantial likelihood of misidentification. *Mysholowsky v. People of State of N. Y.*, 535 F.2d 194, 197 (2d Cir. 1976); *United States ex*

rel. *Pella v. Reid*, 527 F.2d 380, 384 (2d Cir. 1975); *United States ex rel. Beyer v. Mancusi*, 436 F.2d 755, 757 (2d Cir.), *cert. denied*, 403 U.S. 933, 91 S.Ct. 2263, 29 L.Ed.2d 712 (1971); *United States ex rel. Tarallo v. LaVallee*, 433 F.2d 4, 6–7 (2d Cir. 1970), *cert. denied*, 403 U.S. 919, 91 S.Ct. 2235, 29 L.Ed.2d 697 (1971). *Cf. Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

24. *See, e. g., Moore v. Illinois*, 434 U.S. 220, 232, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); *Chapman v. State of Cal.*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

autopsies and witnessed approximately 1,000 others, then associated with the medical examiner's office, testified that he had read and was familiar with the autopsy report. In addition to reciting his extensive experience, he detailed the procedure by which examining doctors make and record findings for autopsy reports.

Just as a dying declaration is admissible without being deemed a violation of an accused's right of confrontation,[25] so too, the New York Court of Appeals has held that an autopsy report made and kept pursuant to statute (as in this case) is admissible under the official records exception to the rule against hearsay and does not offend the confrontation clause of the New York State Constitution.[26] The petitioner urges, however, that the admission of the report without the testimony of those who actually performed or participated in the autopsy impinged upon his right of confrontation under the Sixth Amendment to the United States Constitution.[27]

■ The hearsay rule has many exceptions recognized by both state and federal courts; however, these may not be used to receive in evidence matter that impinges upon a defendant's right to a fundamentally fair trial, including his right under the confrontation clause of the Sixth Amendment, which has been made applicable to the states.[28] The issue of an alleged violation of a federally protected right is to be decided under federal not state law.[29] The Supreme Court has approved the admissibility of hearsay statements or documents even though the declarant is not subject to confrontation and cross-examination, as long as they have the "earmarks of reliability."[30] Official reports, in the federal courts, are a recognized exception to the hearsay rule[31] and have long been deemed admissible, notwithstanding the confrontation clause. The rationale supporting their admissibility is that they have sufficient "indicia of reliability" to "afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement."[32] The autopsy reports in the instant case are official records kept in the regular and usual course of the performance by the medical examiner of his official duties. Their reliability is underscored by the rigid requirements of the New York statute that the examiner who performs the autopsy be a "doctor of medicine and a skilled pathologist and microscopist," and that he record and specify in detail his findings.[33] They meet every indicia of reliability and thus afford a fact-finder a basis for evaluating the information. Indeed, if business records are admissible as an exception to the hearsay rule because they have the "earmarks of reliability" or "probability of

**25.** *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895); *People v. Corey*, 157 N.Y. 332, 51 N.E. 1024 (1898).

**26.** *People v. Nisonoff*, 293 N.Y. 597, 601–04, 59 N.E.2d 420 (1944), *cert. denied*, 326 U.S. 745, 66 S.Ct. 22, 90 L.Ed. 445 (1945). *See also People v. Sugden*, 35 N.Y.2d 453, 460, 363 N.Y. S.2d 923, 928, 323 N.E.2d 169, 172 (1974) where Chief Judge Breitel lists exceptions to the hearsay rule which do not impinge upon an accused's right of confrontation.

**27.** *See Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

**28.** *Id.*

**29.** *Cf. Chapman v. State of California*, 386 U.S. 18, 21–22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**30.** *Palmer v. Hoffman*, 318 U.S. 109, 113–14, 63 S.Ct. 477, 87 L.Ed. 645 (1943).

**31.** *See* Fed.R.Evid. 803(8).

**32.** *Mancusi v. Stubbs*, 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972) (citations omitted) (use of prior testimony of a witness upon a subsequent trial). *See also Dutton v. Evans*, 400 U.S. 74, 80, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *California v. Green*, 399 U.S. 149, 165–68, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895) (testimony of deceased witness who testified at a prior trial); *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892) (dying declaration).

**33.** *See* N.Y. County Law §§ 670–78 (McKinney's 1972).

trustworthiness"[34] then, a fortiori, public records kept pursuant to statute carry greater weight of reliability.

It has specifically been held by our Court of Appeals that the admission at trial of public records kept pursuant to statute does not impinge upon an accused's constitutional right of confrontation. In *Heike v. United States*,[35] the defendants were charged with various violations of law, central to which was effecting the entry into the United States of cargoes of sugar at less than their true weight. The evidence to support the essential and crucial element of the actual weights consisted of entries in dock books made by Assistant United States Weighers at the time the cargoes were weighed. Upon appeal, the convicted defendants contended that the admission of the dock books violated their right of confrontation under the Sixth Amendment. After noting that the records were official and were required to be kept by the weighers under statute or by the nature of their duties, the Court held:

> Such records are admissible without calling the persons who made them, and have been so admissible from a time anterior to the adoption of the Constitution. See *Rex v. Fitzgerald*, 1 Leach, 20; *Rex v. Rhoades*, 1 Leach, 24; *Rex v. Martin*, 2 Camp. 100; and the various text-books on evidence. To exclude them now on the ground on nonconformation would be to give the individual a new guaranty which he did not have when the Constitution was adopted; an interpretation of that instrument which the Supreme Court has condemned.[36]

In the case at bar, the petitioner relies upon his bare assertion that his right under the confrontation clause was violated. It is significant that he has not submitted any factual matter which in the slightest degree suggests that the cause of death was other than the bullet wound of the head and brain. The unverified statement in his brief that a cross-examination of the medical examiner who performed the autopsy might have shown a "possibility" that death was not caused by the bullet wound but by something that occurred during the eight days that Lindsay spent hospitalized after the shooting is, upon the record, sheer conjecture. The fact is that petitioner's trial counsel not only did not cross-examine the medical examiner who testified from the autopsy record that the cause of death was a bullet wound of the head and brain, but never uttered a single word about that subject in his summation.

Indeed, one may question whether upon the evidence presented as to the entry of the bullet through the forehead and into the brain, expert medical opinion was required to establish that the death was due to the injuries which followed the bullet wound.[37] Perhaps a different situation might exist in a case where there is a basis for a contention as to the cause of death. Clearly in this case the cause of death was neither a "crucial" nor a "devastating" fact in the case.[38] Indeed, it was not even of "peripheral significance."[39] On this basis it can be distinguished from those cases relied upon by the petitioner, such as *Pointer v. Texas*,[40] *Douglas v. Alabama*,[41] *Brookhart v.*

**34.** *Palmer v. Hoffman*, 318 U.S. 109, 113–14, 63 S.Ct. 477, 87 L.Ed. 645 (1943). *See also Central R.R. Co. v. Jules S. Sottnek Co.*, 258 F.2d 85, 88 (2d Cir. 1958), *cert. denied*, 359 U.S. 913, 79 S.Ct. 588, 3 L.Ed.2d 574 (1959); *United States v. Leathers*, 135 F.2d 507, 511 (2d Cir. 1943) ("[B]usiness records kept as a matter of ordinary routine are often likely to be more reliable than dying declarations. It cannot be reasonably argued that . . . [their admission] involve[s] any violation of the Sixth Amendment.")

**35.** 192 F. 83 (2d Cir. 1911), *aff'd*, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450 (1913).

**36.** *Id.* at 95.

**37.** *See Salem v. United States Lines Company*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962).

**38.** *Dutton v. Evans*, 400 U.S. 74, 87, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

**39.** *Id. See also Rado v. State of Conn.*, 607 F.2d 572 at 578–581 (2d Cir. 1979).

**40.** 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

**41.** 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

*Janis*,[42] and *Barber v. Page*.[43]

█ Finally, were it assumed, contrary to the foregoing holding, that petitioner's right of confrontation required exclusion of the testimony of the non-attending medical examiner, viewing the totality of evidence and the circumstances attendant upon the crashing of the bullet into the deceased's head and subsequent facts, its admission was harmless beyond a reasonable doubt.[44]

█ The defendant next contends that he was denied a fair trial by the prosecutor's arguments in summation because they were without evidentiary support. Essentially the charge is that the prosecutor sought to explain Cooper's denial that his assailant was present in the store at the time the detectives responded to his telephone call because he was "scared," and further that the prosecutor, in explaining why Cooper was scared, hypothesized that if he had not then made the identification, he was justified in the light of petitioner's conduct both on the night of the murder and at the time of his appearance at the store shortly thereafter in great concern for his safety. The argument did not exceed the bounds of fair advocacy. First, Cooper did testify that he was scared. Petitioner's unexplained appearance at the store, and his ominous inquiry—"Was he the guy?"—warranted the argument that petitioner was there to intimidate Cooper. Upon all the attendant circumstances it was an inference that could reasonably be drawn from the facts.[45] Indeed, this Court has already noted that a reading of the trial testimony of events on that occasion suggests that the visit was far from a social call.

█ As to the claim that it was improper for the prosecutor to raise the issue of perjury by posing a rhetorical question whether the jury believed Cooper and other prosecution witnesses had lied or perjured themselves, the short answer is that defendant's counsel had specifically argued to the jury that the People's witnesses "are lying for some reason or other or . . . are so careless it amounts to lying." The prosecutor was not required to remain tongue-tied in view of this challenge to the credibility of the People's witnesses. The courts have consistently upheld " '[t]he right of the prosecution to rebut an argument raised by the defense, even to the extent of permitting the prosecutor to inject his view of the facts to counter the defense counsel's view of the facts.' "[46] Moreover, it is significant that defense counsel at no time during the prosecutor's summation raised any question or made any objection about the matters now urged as prejudicial constitutional error.[47]

█ Petitioner's final claim that his guilt was not proven beyond a reasonable doubt is without substance. As the foregoing discussion indicates, the People fully established beyond a reasonable doubt each essential element of the crime charged. The record permits no other conclusion. In sum, upon a consideration and review of this entire record, none of the alleged errors, either singly or together, deprived defendant of a fundamentally fair trial. The petition is dismissed.

So ordered.

**42.** 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1965).

**43.** 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

**44.** *See Moore v. Illinois*, 434 U.S. 220, 232, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); *Chapman v. State of California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966).

**45.** *See People v. Wright*, 41 N.Y.2d 172, 391 N.Y.S.2d 101, 359 N.E.2d 696 (1976).

**46.** *Orr v. Schaeffer*, 460 F.Supp. 964, 967 (S.D. N.Y.1978) (quoting *United States ex rel. Craft v. Lefevre*, 432 F.Supp. 93, 96 (S.D.N.Y.1977)).

**47.** *Malley v. Manson*, 547 F.2d 25, 29 (2d Cir. 1976), *cert. denied*, 430 U.S. 918, 97 S.Ct. 1335, 51 L.Ed.2d 597 (1977); *Volpicelli v. Salamack*, 447 F.Supp. 652, 666–67 (S.D.N.Y.), *aff'd*, 578 F.2d 1372 (2d Cir. 1978); *United States ex rel. Fernanders v. Fay*, 241 F.Supp. 51, 56 (S.D.N.Y. 1965), *aff'd sub nom. United States ex rel. Fernanders v. Wallack*, 359 F.2d 767 (2d Cir. 1966) (per curiam). *See also Orr v. Schaeffer*, 460 F.Supp. 964 (S.D.N.Y.1978).